*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0314p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

BATTLE CREEK HEALTH SYSTEM; TRINITY HEALTH-
MICHIGAN,

                         *Plaintiffs-Appellants,*

          *v.*

MICHAEL LEAVITT, Secretary of the United States
Department Of Health and Human Services,
                         *Defendant-Appellee.*

No. 06-1775

―――――――――――

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 05-00014—Wendell A. Miles, District Judge.

Argued: March 9, 2007

Decided and Filed: August 14, 2007

Before: BOGGS, Chief Judge; BATCHELDER and GRIFFIN, Circuit Judges.

―――――――――――

## COUNSEL

―――――――――――

**ARGUED:** John R. Trentacosta, FOLEY & LARDNER, Detroit, Michigan, for Appellants. Jacqueline M. Zydeck, OFFICE OF THE GENERAL COUNSEL, Chicago, Illinois, for Appellee. **ON BRIEF:** John R. Trentacosta, H. William Burdett, Jr., FOLEY & LARDNER, Detroit, Michigan, for Appellants. Jacqueline M. Zydeck, OFFICE OF THE GENERAL COUNSEL, Chicago, Illinois, J. Joseph Rossi, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. Michael J. Philbrick, Joan L. Lowes, HALL, RENDER, KILLIAN, HEATH, & LYMAN, Troy, Michigan, for Amicus Curiae.

―――――――――――

## OPINION

―――――――――――

    GRIFFIN, Circuit Judge. Plaintiffs-appellants Battle Creek Health System ("Battle Creek") and Trinity Health-Michigan ("Trinity Health"), doing business as Mercy General Health Partners, are acute-care hospitals and participating Medicare providers located in southwestern Michigan. Plaintiffs brought the present action against defendant-appellee Michael Leavitt, Secretary of the United States Department of Health and Human Services ("defendant" or "the Secretary"), pursuant

1

to Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg (the "Medicare Act") and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA"), challenging the final administrative decision of defendant denying Medicare reimbursement for certain bad debts incurred by plaintiffs during the fiscal year 1999. The district court affirmed the Secretary's decision, granting summary judgment in favor of defendant and denying plaintiffs' similar motion. *See Battle Creek Health Sys. v. Thompson*, 423 F. Supp. 2d 755 (W.D. Mich. 2006). Plaintiffs now appeal. For the reasons set forth below, we affirm.

I.

A.

Plaintiffs are non-profit, tax-exempt, acute-care hospitals located in southwestern Michigan that provide services to persons covered by Medicare ("Medicare beneficiaries"). The Medicare Act provides a system for payment of health services to eligible elderly and disabled persons. Medicare providers participate in Medicare by entering into an agreement with the Secretary and the Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"), which administers the program for the Secretary. Both plaintiffs are parties to a Medicare participation agreement with defendant.

The present case implicates only Medicare Part A reimbursement for hospital services. Part A authorizes payments primarily for institutional care, including hospital inpatient services and skilled nursing facility services. *See* 42 U.S.C. §§ 1395c-1395i-4. Medicare beneficiaries are responsible for paying a portion of the cost of hospital services in the form of deductibles and coinsurance. 42 C.F.R. §§ 409.80 - 409.83.

Before 1983, the Medicare Act based hospital reimbursement upon a retrospective determination of "reasonable cost" as defined in the Secretary's regulations and identified in a provider's annual cost report. 42 U.S.C. § 1395x(v); 42 C.F.R. § 413.1 *et seq.* In 1983, Congress established a Prospective Payment System ("PPS"), whereby hospital operating costs are reimbursed on a per discharge basis through prospectively fixed rates that are based upon the "diagnostic related group" assigned to the discharge. 42 U.S.C. § 1395ww(d); 42 C.F.R. § 412.1 *et seq.* Certain Medicare payments to hospitals, however, continue to be determined retrospectively and reimbursed on a reasonable cost basis.[1] Included in this latter category are the unpaid deductible and coinsurance obligations of Medicare beneficiaries (Medicare "bad debts") at issue herein. 42 C.F.R. § 412.115(a).

The regulations pertaining to Medicare declare that amounts due to providers from other parties that providers cannot recover are generally not reimbursable under the Medicare program because these bad debts are deemed "deductions from revenue and are not to be included in allowable cost." 42 C.F.R. § 413.89(a).[2] The Secretary will nonetheless reimburse a provider for certain bad debts attributable to deductible and coinsurance amounts related to covered services received from beneficiaries. 42 C.F.R. § 412.115(a). Such reimbursable bad debts are defined at 42 C.F.R. § 413.89(b):

---

[1] The Medicare Act defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services. . . ." 42 U.S.C. § 1395x(v)(1)(A). The statute further provides that "reasonable cost" "shall be determined in accordance with regulations [promulgated by the Secretary] establishing the method or methods to be used, and the items to be included in determining such costs . . . ." *Id.*

[2] Before October 1, 2004, this same regulatory provision was found at 42 C.F.R. § 413.80. Fed. Reg. 48916 (Aug. 11, 2004, effective Oct. 1, 2004).

Bad debts are amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future.

Bad debts are reimbursed in order to prevent the costs of Medicare-covered services from being shifted to non-Medicare patients or their payors. 42 C.F.R. § 413.89(d). Consequently, a provider may receive reimbursement for Medicare bad debt if it meets all of the criteria set forth in 42 C.F.R. § 413.89(e):

(e) Criteria for allowable bad debt. A bad debt must meet the following criteria to be allowable:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The provider must be able to establish that reasonable collection efforts were made.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e).[3] *See also* Provider Reimbursement Manual § 308 (reiterating these four criteria).

The Secretary's Provider Reimbursement Manual ("PRM") contains non-binding guidelines and interpretative rules to assist providers and intermediaries in the implementation of the Medicare regulations.[4] Relevant to the present case, PRM § 310 addresses the "reasonable collection effort[s]" that must be undertaken by providers when seeking to recoup bad debts:

To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients. It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations. It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a genuine, rather than a token, collection effort. The provider's collection effort may include using or threatening to use court action to obtain payment. (See § 312 for indigent or medically indigent patients.)

PRM § 310.A further explains:

A provider's collection effort may include the use of a collection agency in addition to or in lieu of subsequent billings, follow-up letters, telephone and personal

---

[3] When plaintiffs first sought recovery of the bad debts, this provision was found at 42 C.F.R. § 413.80. Section 413.80 was redesignated as § 413.89 at 69 Fed. Reg. 48916 (Aug. 11, 2004, effective Oct. 1, 2004). The text of the 1998 and 2004 regulations is identical, and we will, throughout this opinion, refer to the newest regulation.

[4] *See* TEXT, *infra*, Section II.

contacts. Where a collection agency is used, Medicare expects the provider to refer all uncollected patient charges of like amount to the agency without regard to class of patient. The "like amount" requirement may include uncollected charges above a specified minimum amount. Therefore, if a provider refers to a collection agency its uncollected non-Medicare patient charges which in amount are comparable to the individual Medicare deductible and coinsurance amounts due the provider from its Medicare patient, Medicare requires the provider to also refer its uncollected Medicare deductible and coinsurance amounts to the collection agency. Where a collection agency is used, the agency's practices may include using or threatening to use court action to obtain payment.

In addition, PRM § 310.2 provides for a "Presumption of Noncollectibility":

If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible.

"The amounts uncollectible from specific beneficiaries are to be charged off as bad debts in the accounting period in which the accounts are deemed to be worthless." 42 C.F.R. § 413.89(f). Consistent with this regulation, PRM § 314 provides that uncollectible debts and coinsurance amounts "are recognized as allowable bad debts in the reporting period in which the debts are determined to be worthless." PRM § 314 also requires the provider to document its claimed bad debts ("the provider should have the usual accounts receivable records – ledger cards and source documents – to support its claim for a bad debt for each account included."). *See also* PRM § 310.B ("[t]he provider's collection effort should be documented in the patient's file by copies of the bill(s), follow-up letters, reports of telephone and personal contact, etc."). These guidelines are in keeping with regulations that require documentation. *See* 42 C.F.R. §§ 413.9, 413.24, and 413.20(a) ("[t]he principles of cost reimbursement require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program.").

PRM § 316 further addresses the recovery of bad debts and provides in pertinent part:

Amounts included in allowable bad debts in a prior period might be recovered in a later reporting period. Treatment of such recoveries under the program is designed to achieve the same effect upon reimbursement as in the case where the amount was uncollectible.

Where the provider was reimbursed by the program for bad debts for the reporting period in which the amount recovered was included in allowable bad debts, reimbursable costs in the period of recovery are reduced by the amounts recovered. However, such reductions in reimbursable costs should not exceed the bad debts reimbursed for the applicable prior period.

Fiscal intermediaries under contract to the Secretary[5] serve as claims managers for the Medicare program and make the initial determination regarding the amount of reimbursement to be paid to the health care provider. At the close of a fiscal year, a Medicare provider submits a cost report to its fiscal intermediary setting forth its incurred costs and the proportion of the costs to be allocated to Medicare. 42 C.F.R. § 413.20. The fiscal intermediary audits the report and ascertains the final amount of Medicare reimbursement owed to the provider. 42 U.S.C. § 1395g. The fiscal intermediary then issues a Notice of Program Reimbursement ("NPR"). 42 C.F.R. § 405.1803.

---

[5]In this case, plaintiffs' fiscal intermediary is United Government Services, Inc. ("UGS").

The Secretary has issued guidelines for fiscal intermediaries to follow when auditing cost reports. The Intermediary Manual instructs in part:

> If the bad debt is written-off on the provider's books 121 days after the date of the bill and then turned over to a collection agency, the amount cannot be claimed as a Medicare bad debt on the date of the write-off. It can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.

Intermediary Manual, Part 1B, 13-2.

An HCFA policy memorandum dated June 11, 1990, further elaborates on the bad debt policy. The memorandum states in pertinent part:

> [U]ntil a provider's reasonable collection effort has been completed, including both in-house efforts and the use of a collection agency, a Medicare bad debt may not be reimbursed as uncollectible. This is in accord with the fourth criterion in section 308 which provides that an uncollected Medicare account cannot be considered an allowable Medicare bad debt unless sound business judgment established that [there] is no likelihood of recovery at any time in the future. We have always believed that, clearly, there is a likelihood of recovery for an account sent to a collection agency and that claiming a Medicare bad debt at the point of sending the account to the collection agency would be contrary to the bad debt policy in sections 308 and 310
> . . . .

If a Medicare provider is dissatisfied with the fiscal intermediary's determination of reimbursement and otherwise satisfies applicable criteria, it is entitled to a hearing before the Secretary's Provider Reimbursement Review Board ("PRRB"), within 180 days of receipt of the NPR. 42 U.S.C. § 1395oo(a), (b); 42 C.F.R. §§ 405.1835, 405.1837. The PRRB's decision is subject to review, upon written request by one of the parties, by the Deputy Administrator of CMS (the "Administrator"), pursuant to 42 C.F.R. § 405.1875. The Administrator's decision, which constitutes the final decision of the Secretary, is in turn subject to review by the appropriate federal district court. 42 U.S.C. § 1395oo(f)(1).

B.

In this case, the fiscal intermediary audited plaintiffs' fiscal year ("FY") 1999 cost reports for the period ending June 30, 1999, and disallowed $155,822 and $327,829 in bad debts claimed by plaintiffs Battle Creek and Trinity Health, respectively. The intermediary determined that plaintiffs had included and written off as bad debts on their cost reports any Medicare accounts that were at least 120 days old by the end of the cost reporting period, including debts that had been referred to the collection agency. The intermediary concluded that the debts that were sent to the collection agency, but not returned to plaintiffs as uncollectible, did not meet the requirements of 42 C.F.R. § 413.89(e)(3) and (4), because these debts had never been determined to be uncollectible and collection efforts could be expected to continue after the accounts were written off. According to the fiscal intermediary, the fact that the bad debts remained at a collection agency constituted evidence that plaintiffs did not consider the accounts to be worthless or that there was no likelihood of recovery at any time in the future.

Plaintiffs appealed these disallowances to the PRRB which, following a hearing on the matter, concluded that the intermediary's determination was erroneous and held that plaintiffs were

entitled to reimbursement for the bad debts invalidated by the fiscal intermediary.**6**  The PRRB found that the evidence at the hearing established that plaintiffs undertook reasonable collection efforts in accordance with 42 C.F.R. § 413.89(e).  The PRRB was "unable to reconcile" the intermediary's position with either the presumption of noncollectibility set forth in PRM § 310.2 or with PRM § 310.A, which states that a provider's use of a collection agency may be "in addition to or in lieu of" collection efforts undertaken by the provider itself.  Thus, according to the PRRB, "the Intermediary's argument that the Provider's use of an outside collection agency obligated the Provider to engage in its collection efforts for a period greater than the 120 days set forth in [PRM] § 310.2 is not supported by the applicable Medicare regulations or manual instructions."  The PRRB further concluded that

> [PRM] § 316 indicates that when a provider, in a later period, recovers amounts previously included in allowable bad debts, the provider's reimbursable costs in the period of recovery are reduced by the amounts so recovered.  Thus, it is reasonable to infer that the Medicare program expects that providers will continue to pursue collection activities with respect to debts that have been deemed uncollectible for Medicare reimbursement purposes.

The PRRB therefore held that plaintiffs were entitled to Medicare reimbursement for the bad debts at issue.

Upon further review by the Administrator, the PRRB's decision was reversed.  In a final Decision of the Administrator issued on November 12, 2004, the Administrator held that the language of PRM § 310.2 "implies discretionary rather than mandatory application of the presumption, i.e., the debt 'may' rather than 'shall' be deemed uncollectible" if it remains unpaid for more than 120 days.  Consequently, the Administrator found that the presumption of noncollectibility does not relieve a provider from meeting the regulatory documentation requirements for ascertaining bad debts and "only applies where a provider has otherwise demonstrated through appropriate documentation that it engaged in reasonable collection efforts."  Relying upon the Intermediary Manual, Part IB, 13-2 and the June 11, 1990, policy memorandum, as well as the relevant regulations and PRM sections, the Administrator concluded that if a provider continues to attempt collection of a debt either through in-house efforts or a collection agency,

> it is reasonable to conclude that the provider still considers the debt to have value and not worthless.  Thus, contrary to the Provider's argument, the Administrator finds it reasonable to expect a provider to demonstrate that it has completed its collection effort, including outside collection, before claiming debts as worthless.

Under the circumstances, the Administrator found the requisite documentation had not been provided:

> The Administrator notes that the Provider's testimony suggested that the collection agency furnished a report telling the Provider which of its accounts were uncollectible and worthless, and which ones the collection agency still pursued. However, the Provider admitted that it did not request such reports and indicated that it had not attempted to compare what it had written off as bad debt and what the

---

**6**Plaintiffs also appealed another unrelated disallowance pertaining to the Secretary's adjustment to plaintiff Battle Creek's report.  The Tax Equity and Fiscal Responsibility Act ("TEFRA") established a ceiling on the allowable rate-of-increase for hospital inpatient operating costs.  The TEFRA Target Amount for a provider is updated for each hospital cost reporting period by an annual rate-of-increase percentage.  Plaintiffs' complaint included a claim challenging the adjustment to Battle Creek's TEFRA rate.  However, the parties resolved and stipulated to dismissal of this claim, which was dismissed by order of the court entered on March 6, 2006.

collection agency was actually still collecting on. In addition, the record contains no evidence reflecting the point in time when the debts were actually uncollectible. There is no documentation of when, or if, the collection agency returned the debts to the provider, or otherwise informed the provider that collection efforts were terminated.

In light of these documentation deficiencies, the Administrator concluded that the presumption of noncollectibility did not apply because plaintiffs had failed to establish that the accounts were "actually uncollectible" when claimed as worthless or that "sound business judgment" established that there was no likelihood of recovery at any time in the future, pursuant to 42 C.F.R. § 413.80(e)(3) and (4). The Administrator therefore disallowed reimbursement for the FY 1999 bad debts.[7]

On January 20, 2005, plaintiffs filed the present suit in federal district court, challenging the Administrator's final decision. In response to cross-motions for summary judgment, the district court denied plaintiffs' motion and granted defendant's summary judgment motion, affirming the Secretary's final decision denying Medicare reimbursement for the FY 1999 bad debts claimed by each plaintiff. The district court found that the Secretary's interpretation of § 310.2 of the PRM gave effect to each of the four requirements of 42 C.F.R. § 413.89(e), and therefore was not arbitrary and capricious nor inconsistent with Medicare policy. *Battle Creek Health Sys.*, 423 F. Supp. 2d at 761-62. This appeal followed.

II.

When reviewing an administrative agency's final decision under the APA, we review the district court's summary judgment decision de novo, while applying the "appropriate standard of review" to the agency's decision. *Fligiel v. Samson*, 440 F.3d 747, 750 (6th Cir. 2006). In the context of Medicare reimbursement, the scope of judicial review is narrow:

> The Supreme Court has established a two-step process for reviewing an agency's interpretation of a statute that it administers. *Chevron U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837 (1984). "First, always, is the question whether Congress has directly spoken to the *precise question at issue*. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 273 (6th Cir. 1994) (emphasis in original) (citing *CenTra, Inc. v. United States*, 953 F.2d 1051 (6th Cir. 1992)). The Supreme Court has explained that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear legislative intent." *Chevron*, 467 U.S. at 843 n.9.

---

[7]The Administrator further disagreed with the PRRB's conclusion that the language of PRM § 316, pertaining to the subsequent payment of a previously reimbursed bad debt, supported an inference that the Medicare program expects that providers will continue to pursue bad debt collection activities after being reimbursed:

> [T]his PRM section provides only an instruction, in the event that a Medicare bad debt is subsequently recovered, for reporting such revenue and its reimbursement effect. This is a provision to prevent double dipping by the Provider at the expense of the Program. The Administrator finds that the language of the manual section in no way infers that the Medicare program *expects*, or even anticipates, providers to continue to pursue collection activities after claiming Medicare bad debts on their cost reports.

(Emphasis in original.)

Second, if we determine that Congress has not directly addressed the precise question at issue, that is, that the statute is silent or ambiguous on the specific issue, we must determine "whether the agency's answer is based on a permissible construction of the statute." *Jewish Hosp., Inc.*, 19 F.3d at 273. In assessing whether the agency's construction is permissible, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 273-74 (citing *Chevron*, 467 U.S. at 843 n.11). In fact, the agency's construction is entitled to deference unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

Our review of an agency's interpretation of its own regulations is highly deferential. Pursuant to 42 U.S.C. § 1396oo(f)(1), a decision by the [CMS] is subject to review under the [APA], 5 U.S.C. § 706(2)(A). Under the APA, we review an agency decision to see whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). Under the APA, an agency's interpretation of a regulation must be given controlling weight unless it is "plainly erroneous or inconsistent with the regulation." *Id.*

*Clark Reg'l Med. Ctr. v. U.S. Dept. of Health & Human Servs.*, 314 F.3d 241, 244-45 (6th Cir. 2002). *See also Med. Rehab. Servs., P.C. v. Shalala*, 17 F.3d 828, 831 (6th Cir. 1994) (agency's interpretation of its own regulations accorded considerable deference, "especially in areas like Medicare reimbursements.").

However, "[i]nterpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Thus, "[i]nterpretative guidance from administrative agencies that is not the product of formal, notice-and-comment rulemaking is entitled to respect 'to the extent that the interpretations have the power to persuade.'" *Bank of New York v. Janowick*, 470 F.3d 264, 269 (6th Cir. 2006) (quoting *Christensen*, 529 U.S. at 587) (internal quotations and citations omitted).[8] *See also Clark Reg'l Med. Ctr.*, 314 F.3d at 248 ("The PRM is 'the prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'") (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)); *St. Mary's Hosp. of Troy v. Blue Cross & Blue Shield Ass'n*, 788 F.2d 888, 890 (2d Cir. 1986) (PRM is an "interpretive" source entitled to persuasive weight).

III.

Battle Creek and Trinity Health, with the support of amicus curiae Michigan Health and Hospital Association, a membership organization representing 145 Michigan acute-care hospitals, argue that the Secretary's determination that plaintiffs failed to satisfy regulatory requirements for reimbursement of the bad debts at issue is arbitrary and capricious, not only because plaintiffs had no notice of the new standard, but also because the decision purportedly has no basis in, and conflicts with, the Secretary's current published regulations and reimbursement guidelines issued to Medicare providers. Specifically, plaintiffs complain that "[t]he Secretary's newly-imposed

---

[8] As we have noted, "[w]here an administrative agency creates manual provisions that are inconsistent with the governing regulations, it creates for itself a kind of open-ended discretion in its administrative investigations, and opens the door to disparate treatment of interested parties." *Maximum Home Health Care, Inc. v. Shalala*, 272 F.3d 318, 321 (6th Cir. 2001). "It undermines the clear congressional purpose underlying the requirement that significant rules be established by regulations." *Id.*

requirement that providers discontinue collection agency efforts before seeking reimbursement of debts outstanding for more than 120 days is inconsistent with the § 310.2 presumption and with Medicare's requirement that its beneficiaries bear the costs of deductibles and co-insurance [set forth in] 42 U.S.C. § 1395x(v)(1)(A)."

Plaintiffs, however, have failed to persuade us that the Secretary's action in denying reimbursement to plaintiffs for the FY 1999 bad debts in question, based upon his interpretation of the germane Medicare-related regulations, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." *Clark Reg'l Med. Ctr.*, 314 F.3d at 245. In affirming the Secretary's decision, we have carefully considered the following arguments advanced by plaintiffs and amicus curiae regarding the significant regulatory issue raised in this case.

Battle Creek and Trinity Health first maintain that they are entitled to rely upon the presumption of noncollectibility set forth in PRM § 310.2. According to plaintiffs, this presumption establishes a mandatory, bright-line rule that a provider may deem bad debts uncollectible and worthless after at least 120 days of reasonable collection efforts and, so interpreted, eliminates the administrative costs that otherwise would be incurred by having to demonstrate noncollectibility on a debt-by-debt basis. They argue that the Secretary's mandate – that providers discontinue collection agency efforts before seeking reimbursement of debts outstanding for more than 120 days – essentially abolishes the presumption and renders PRM § 310.2 meaningless.

Plaintiffs further posit that to the extent that the presumption in PRM § 310.2 is discretionary, the presumption only has significance if it is *the provider*, not the fiscal intermediary, that has the discretion to apply the presumption, because the fiscal intermediary does not audit cost reports until a year after the close of the cost reporting year. Consequently, a provider would not know if the presumption would be applied until it was too late to rely upon it. As a result, a provider purportedly would have no option but to ignore the presumption and make a debt-by-debt determination of noncollectibility, precisely the time-consuming task that the presumption was meant to obviate.

In rejecting plaintiffs' argument, we initially note that the Medicare Act grants the Secretary broad discretion to determine which "reasonable costs" may be reimbursed to Medicare providers, 42 U.S.C. § 1395x(v)(1)(A), and what information is required from providers as a condition of reimbursement, 42 U.S.C. § 1395g(a). Pursuant to this broad statutory authority, the Secretary promulgated the various regulations implicated herein pertaining to bad debt reimbursement and the documentation required to substantiate reimbursement requests. 42 C.F.R. § 413.20(a) requires providers "to maintain sufficient financial records and statistical data for proper determination of costs payable under the program." Related to this requirement, 42 C.F.R. § 413.89(e), the focal point of this litigation, provides that bad debts may be reimbursed as "reasonable costs" only if four criteria are met, including the two criteria at issue in this case – "the debt was actually uncollectible when claimed as worthless" and "[s]ound business judgment established that there was no likelihood of recovery at any time in the future." 42 C.F.R. § 413.89(e)(3) and (4).[9] The presumption of noncollectibility set forth in PRM § 310.2 states that, "[i]f after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt *may* be deemed uncollectible." (Emphasis added). This interpretive guideline must be read in such a way that it is consistent with the plain language of the regulation. *See Guernsey Mem'l Hosp.*, 514 U.S. at 99-100 (Interpretive rules do not have force and effect of law and do not effect a "substantive change" that is inconsistent with existing regulations.).

---

[9] It is undisputed that with regard to the FY 1999 bad debts in controversy, plaintiffs complied with the first two criteria of 42 C.F.R. § 413.89(e) and adequately demonstrated that the debts were incurred for covered services and reasonable collection efforts were undertaken. 42 C.F.R. § 413.89(e)(1) and (2).

The Secretary opined that the presumption of noncollectibility is discretionary in nature and was not to be applied automatically for the benefit of plaintiffs in this case despite the passage of 120 days, because the accounts in question had been referred to a collection agency and not yet returned to the provider as uncollectible. Thus, according to the Secretary, plaintiffs failed to show that the "debt was actually uncollectible when claimed as worthless" and that "[s]ound business judgment established that there was no likelihood of recovery at any time in the future," as called for by 42 C.F.R. § 413.89(e)(3) & (4).

We find the Secretary's interpretation of § 413.89(e) to be eminently reasonable. First, it conforms to the plain language of the regulation and PRM § 310.2. Plaintiffs' debts did not meet the criteria for reimbursement because the debts at issue were being serviced by a collection agency when claimed as worthless. The very fact that a collection agency was still attempting to collect the bad debts at issue indicates that these debts had not yet been determined to be "actually uncollectible when claimed as worthless" and certainly contraindicates that "[s]ound business judgment established that there was no likelihood of recovery at any time in the future." 42 C.F.R. § 413.89(e)(3) and (4). These criteria cannot be met until the collection agency completes its collection effort and returns the debts to plaintiffs as uncollectible. Moreover, as the Secretary determined properly, the language in PRM § 310.2 is discretionary in nature ("*may* be deemed"), rather than mandatory. *See Matovski v. Gonzales*, — F.3d —, 2007 WL 1713306, *16 (6th Cir. June 15, 2007) ("[T]he regulation employs the term 'may' not 'shall,' implying that the grant of authority [bestowed by the regulation] is permissive not mandatory."). Thus, application of the presumption is not inevitable in every instance due to the mere passage of 120 days following a provider's use of reasonable collection efforts.

Second, from a practical standpoint, if the presumption of noncollectibility is characterized as mandatory, as plaintiffs argue, then the third and fourth criteria of 42 C.F.R. § 413.89(e) would be rendered nugatory. We agree with the district court's assessment that

> [t]o permit a provider to deem a debt uncollectible after 120 days for Medicare reimbursement purposes, but to continue its efforts to collect the debt would be inconsistent with the requirements that the debt was actually uncollectible and there was no likelihood of future collection. Such an interpretation would transform the four-requirement statute [42 C.F.R. § 413.89(e)] into a two-requirement statute: (1) The debt must be related to covered services and derived from deductible and coinsurance amounts, and (2) the provider must be able to establish that reasonable collection efforts were made for 120 days. The Court cannot conclude that it was arbitrary or capricious, or inconsistent with Medicare policy for the Secretary to interpret section 310.2 of the PRM in a manner that gave effect to each of the four requirements.

*Battle Creek Health Systems*, 423 F. Supp. 2d at 761.

PRM § 310.2 neither expressly nor implicitly excuses a provider from satisfying the specific criteria of § 413.89(e). Indeed, when read in tandem with the regulation, we agree with the district court that the Secretary has interpreted the presumption of noncollectibility in a manner that is consistent with, and most effectively enforces, all of the criteria of 42 C.F.R. § 413.89(e).

Likewise, the presumption of noncollectibility does not relieve a provider from fulfilling the specific documentation requirements of PRM §§ 310 and 314. Plaintiffs argue that the Secretary's reliance upon PRM §§ 310 and 314 as a basis for his decision is misplaced, because neither guideline imposes any requirement that providers cease collection efforts before deeming the debts uncollectible pursuant to the presumption of noncollectibility. Battle Creek and Trinity Health contend that PRM § 310.A, which states that a provider's use of a collection agency may be "in

addition to or in lieu of" its own collection efforts, actually encourages providers to use collection agencies to recoup Medicare bad debts and thus reinforces their argument that there is no regulatory basis for requiring a Medicare provider to recall a bad debt from a collection agency before the debt can be deemed worthless pursuant to 42 C.F.R. § 413.89(e). Again, we disagree.

These PRM provisions are part of the overall framework of the Medicare reimbursement scheme, implemented by the Secretary to provide guidance regarding specific methods of collection and documentation. PRM § 310 addresses the "reasonable collection effort" that must be undertaken by providers when seeking to recoup bad debts, PRM § 310.A states that a provider's collection efforts may include the use of a collection agency, PRM § 310.B provides that the provider's collection effort "should be documented in the patient's file by copies of the bill(s)and [other letters or reports]," and PRM § 314 states that a provider "should have the usual accounts receivable records-ledger cards and source documents to support its claim for a bad debt for each account included." While these sections of the PRM do not address explicitly the issue of finality of collection efforts, conversely, nothing in the text of these manual provisions contradicts or precludes the Secretary's mandate that, for documentation purposes, a provider must show concretely, when a collection agency is used by the provider, that those debts in the hands of the collection agency are truly uncollectible before the presumption will apply. As the Secretary properly held, PRM § 310.2 "does not suggest that this 'presumption' relieves the Provider from meeting the general regulatory documentation requirements or the specific documentation requirements in sections 310.B and 314 of the PRM."

Battle Creek and Trinity Health further argue that the Secretary's decision is contrary to PRM § 316, which, according to plaintiffs, encourages providers to continue collection efforts after the provider has been reimbursed by the Medicare program for a bad debt. Plaintiffs maintain that the Secretary's decision appears to be grounded in part in a concern that providers would be able to obtain double recovery for bad debts that are paid after reimbursement. Plaintiffs note, however, that this concern is addressed expressly in PRM § 316, which requires a provider to reimburse Medicare for bad debts that are collected in a later reporting period after CMS has reimbursed the provider for the same. Section 316 therefore supports "the obvious inference . . . that seeking reimbursement for bad debts does not require discontinuation of on-going collection efforts. . . ."

However, this common-sense provision merely recognizes that if a provider recovers amounts previously included in allowable bad debts, it must reduce reimbursable costs in the period during which the debt was recovered by the same amount. As the district court found, "Section 316 is not incompatible with the Secretary's decision that debts are not reimbursable until collection efforts have ceased" and "it is not unreasonable for the Secretary to include guidelines to govern that situation." *Battle Creek Health Systems*, 423 F. Supp. 2d at 762.

Plaintiffs also challenge the sources underlying the Secretary's decision, claiming that the Intermediary Manual should be disregarded because it is issued only to fiscal intermediaries, not providers, and, from a substantive standpoint, Part IB, 13-2 of the Intermediary Manual allegedly conflicts with PRM § 310.2 and deprives a provider of the discretion to use its sound business judgment in determining which accounts are worthless and uncollectible. Plaintiffs likewise assert that the Secretary's reliance upon the June 11,1990, HFCA policy memorandum is arbitrary and capricious because the memorandum actually imposes more stringent requirements than called for in 42 C.F.R. § 413.89(e)(3) and (4).

To the contrary, the Intermediary Manual and the HFCA policy memorandum serve to bolster the Secretary's interpretation of 42 C.F.R. § 413.89(e). The Intermediary Manual advises that a Medicare bad debt cannot be claimed as reimbursable until "after the collection agency completes its collection effort." Intermediary Manual, Part IB, 13-2. The policy memorandum

similarly provides, "in accord with the fourth criterion in section 308," that "until a provider's reasonable collection effort has been completed, including both in-house efforts and the use of a collection agency, a Medicare bad debt may not be reimbursed as uncollectible." As noted previously, these interpretive tools are entitled to respect to the extent that those interpretations have the power to persuade and, so long as these interpretive sources are not inconsistent with promulgated regulations or outside of coverage of the Act, they are valid. *Clark Reg'l Med. Ctr.*, 314 F.3d at 245. In this case, the provisions of the Intermediary Manual and policy memorandum are persuasive, consistent with the regulatory provisions, and thus valid sources upon which the Secretary can legitimately rely.

Plaintiffs' contention that the Intermediary Manual is not a usable interpretive source because providers are not given notice of its provisions is without merit. Although it is directed to fiscal intermediaries for auditing purposes, the Intermediary Manual is often referenced by the courts as an authoritative source. *See Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 161-62 (3d Cir. 2004); *Fanning v. United States*, 346 F.3d 386, 400-01 (3d Cir. 2003); *Tenet Health Sys. HealthCorp. v. Thompson*, 254 F.3d 238, 249 (D.C. Cir. 2001); *Keefe on Behalf of Keefe v. Shalala*, 71 F.3d 1060, 1066-67 (2d Cir. 1995). The Intermediary Manual is also available for public perusal on the CMS website.[10]

Next, Battle Creek and Trinity Health suggest that the Secretary's decision will deprive providers of the discretion and the ability to exercise their "sound business judgment" in deeming a bad debt uncollectible, and places this discretion in the hands of the fiscal intermediary or the collection agency. This fear, however, is unfounded for the reasons explained by the district court:

> [T]he Secretary's interpretation does not wrest discretion from service providers. After 120 days of reasonable and customary collection efforts, it is within the discretion of the service provider to either continue collection efforts or cease collection efforts and deem the debt uncollectible. The Secretary merely requires that a service provider take one course or the other in order to satisfy the four criteria entitling a provider to reimbursement. Moreover, the Secretary's interpretation does not preclude, nor necessarily discourage, service providers from using collection agencies, as Plaintiffs argue. If a service provider has determined that, in general, turning its receivables over to a collection agency at a given point in the collection process is beneficial, it may still do so.

*Battle Creek Health Systems*, 423 F. Supp. 2d at 761-62.

Finally, we conclude that the dire public policy concerns cited by plaintiffs and amicus curiae will not come to fruition. Battle Creek and Trinity Health claim that as a result of the Secretary's decision, it will be cost-prohibitive for providers, annually faced with thousands of bad debts, to document decisions regarding each account on a case-by-case basis; the Secretary's documentation requirement will shift costs and burdens of Medicare to "individuals not covered by the Medicare program. . . ." 42 C.F.R. § 413.89(d). Plaintiffs note that there is no additional cost to providers or ultimately to the Medicare program by allowing bad debts to remain at the collection agency beyond 120 days; in practical terms, collection agencies are often the only cost-effective avenue to pursue stale accounts in a cost-efficient manner. Plaintiffs argue that the purpose of PRM § 310.2 is to simplify, not increase, providers' administrative burdens and costs.

The testimony taken at the PRRB hearing in this case established that it would not have been unduly burdensome for plaintiffs to determine the date that the collection agency found that the

---

[10]See http://www.cms.hhs.gov/Manuals.

debts were uncollectible. Battle Creek's Regional Director of Accounts Receivable, Robert Hammond, testified that the providers received a monthly report from the collection agency listing, on a case-by-case basis, which accounts were considered worthless and active or inactive. Plaintiffs, however, were not using the information contained in these reports to determine the date that the debts were uncollectible and did not reconcile these reports with their own records because they had already written off the debts as reimbursable. Thus, there was no attempt to compare what plaintiffs had written off as bad debt with those accounts the collection agency was still actively pursuing. Battle Creek and Trinity Health could have determined, with minimal increased cost and effort, the date that the debts were determined to be uncollectible.

This evidence also belies plaintiffs' claim that both the Medicare program and the hospitals will lose revenue if they are forced to comply with the Secretary's decision. Plaintiffs anticipate that the policies advocated by the Secretary will act as a disincentive for providers to continue collection efforts beyond 120 days, which will ultimately have a negative fiscal impact on both the Medicare program as well as providers. Further, because the requirements of § 310 require that all patients be treated the same, plaintiffs anticipate that the cessation of collection efforts will apply to all patients, not just Medicare beneficiaries.

The Secretary's decision, however, does not deprive plaintiffs or other providers of reimbursement for Medicare bad debts; rather, it merely requires them to engage in the same sound business practices that they use when pursuing non-Medicare debt. It is not unreasonable for the Secretary to require providers to exhaust every available method of collection before receiving reimbursement for uncollectible debts. Providers using collection agencies will still receive reimbursement, after the collection agency completes its collection efforts and the debt is determined to be uncollectible. Moreover, because, as noted above, precise information on individual bad-debt accounts is readily obtainable from collection agencies (but was not utilized by the present plaintiffs), the documentation requirements now levied by the Secretary should not deter providers from using such agencies as a resource. In sum, through his decision, the Secretary, as the steward of the Medicare system, has reasonably reinforced providers' accountability to him.

IV.

We hold that the Secretary's final decision disallowing Medicare reimbursement for the bad debts at issue incurred by plaintiffs Battle Creek and Trinity Health during the fiscal year 1999 is neither arbitrary nor inconsistent with the governing Medicare regulations and is supported by substantial evidence. Therefore, we defer to the Secretary's reasonable interpretation of the Medicare Act and accompanying regulations that he administers. For the foregoing reasons, we affirm the judgment of the district court.