IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 29, 2008

Charles R. Fulbruge III
Clerk

No. 07-30306

COMMUNITY CARE, LLC, doing business as Community Care Hospital

Plaintiff–Appellant

v.

MICHAEL O LEAVITT, SECRETARY, DEPARTMENT OF HEALTH &
HUMAN SERVICES

Defendant–Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

The dispute in this administrative appeal arises under the Federal Medicare Program administered by the Centers for Medicare and Medicaid Services ("CMS"). Plaintiff-Appellant Community Care Hospital ("CCH") appeals the district court's grant of summary judgment in favor of the Secretary of Health and Human Services ("the Secretary"), upholding the Secretary's administrative decision. For the following reasons, we AFFIRM.

I.

CMS is the agency of the Department of Health and Human Services responsible for administering the Medicare program. CMS contracts out its payment and audit functions under the Medicare program to non-government

organizations or agencies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due to Medicare providers under Medicare law, regulations, and interpretative guidelines published by CMS. See 42 U.S.C. § 1395h; 42 C.F.R. §§ 413.20-.24.

In 1997, Congress passed the Balanced Budget Act of 1997, Pub. L. No. 105-33, which mandated that the Medicare program apply a Prospective Payment System ("PPS") of reimbursement to skilled nursing facilities ("SNFs")[1] for all cost-reporting periods beginning on or after July 1, 1998. 42 U.S.C. § 1395yy(e). Under PPS, SNFs were no longer paid under a reasonable cost-based system.

CCH is a forty-bed hospital located in New Orleans, Louisiana, and was certified as a Medicare provider in 1994. As a Medicare provider, CCH is required to submit a cost report to its fiscal intermediary annually. In 1998, CCH adopted a cost-reporting period of April 1, 1998, to April 30, 1999.

In early April 1999, shortly before the end of CCH's 1998/1999 cost-reporting period, Medicare certified one floor of the hospital as an SNF. On April 10, 1999, the SNF admitted its first skilled nursing patient. CCH submitted one cost report for both the hospital and the SNF, utilizing only the hospital's cost-reporting period. Because the hospital's cost-reporting period began on April 1, 1998–before the effective date of the implementation of PPS for SNFs (i.e., July 1, 1998)–CCH claimed reimbursement for the SNF on the reasonable-cost basis.

TriSpan Health Services ("TriSpan"), CMS's fiscal intermediary, initially accepted CCH's cost report. TriSpan, however, reversed its position in July 2001, stating that it would impose the PPS methodology of reimbursement for

---

[1] A skilled nursing facility is an institution (or a distinct part of an institution) that provides skilled nursing care and related services or rehabilitation services and meets the other requirements listed in 42 U.S.C. § 1395i-3.

CCH's SNF. The impact of this decision was a disallowance of $335,465.00 in costs that CCH had incurred. In August 2001, CMS indicated that a reasonable cost-based methodology should apply to the SNF because CCH's cost report began on April 1, 1998. TriSpan, therefore, reversed itself again, once again accepting CCH's cost report. However, on October 1, 2001, CMS changed its position, informing CCH that it had two cost reporting periods–one beginning April 1, 1998, for its hospital and one beginning April 8, 1999, for its SNF. Consequently, according to CMS, CCH's SNF cost-reporting period began after July 1, 1998, subjecting it to the PPS method of reimbursement. Accordingly, TriSpan withdrew its reversal and refused to accept CCH's cost report.

CCH appealed the final decision to the Provider Reimbursement Review Board ("PRRB"), which found that CCH correctly submitted one cost report for both the hospital and the SNF, and, therefore, reasonable cost-based methodology was warranted. The CMS Administrator–on behalf of the Secretary–reversed the decision of the PRRB ("the Secretary's decision"). Interpreting provisions of the Medicare Provider Reimbursement Manual ("PRM"),[2] the CMS Administrator stated:

> [T]he Administrator finds that the hospital-based SNF is a separate entity from the hospital under the Medicare program. While a hospital-based SNF has the same cost reporting year end as the hospital, the beginning of the cost reporting period can be different in the case of a newly certified SNF provider. In that instance, the start of the cost reporting period is necessarily controlled by when the Provider first rendered patient care services which could be covered by Medicare.

Cmty. Care Hosp., Review of: PRRB Dec. No. 2005-D30, at 4-5 (H.H.S. Apr. 8, 2005) (footnote omitted).

---

[2] The PRM contains "non-binding guidelines and interpretative rules to assist providers and intermediaries in the implementation of the Medicare regulations." Battle Creek Health Sys. v. Leavitt, 498 F.3d 401, 404 (6th Cir. 2007).

CCH appealed the Secretary's decision to the district court on August 11, 2005. The parties filed cross-motions for summary judgment. The district court granted the Secretary's motion and denied CCH's motion, holding that, based on the Medicare statutes, regulations, and interpretive guidelines, the Secretary's conclusions were not arbitrary or capricious. CCH now appeals.

II.

CCH sought judicial review of the Secretary's decision pursuant to 42 U.S.C. § 1395oo(f), which "requires us to apply the standard of review applicable to actions arising under the Administrative Procedure Act." Sun Towers, Inc. v. Heckler, 725 F.2d 315, 325 (5th Cir. 1984). Our review is thus limited to the question of whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . ." 5 U.S.C. § 706(2)(A).

III.

This case turns on the interpretation of various provisions contained in agency manuals relating to cost-reporting periods for Medicare providers. At the center of this controversy is PRM § 102.1, which provides that:

> In the case of a newly constructed provider that enters the Medicare program during its initial business year, . . . provider operations are considered to commence for cost reporting purposes when the first patient is admitted as an inpatient or receives outpatient services (hospital or SNF) . . . . Therefore, a provider's initial cost reporting period may not start before the beginning of the month in which it first renders patient care services which could be covered under the program. . . .
>
> B. New Providers.–A provider . . . is considered to be a new provider upon its entry into the program if it enters the program at the inception of or during its initial business year. . . .
>
> If the provider does not begin operations until after the effective date of its entry into the program, the initial reporting period will

begin with the first day of the month in which patient care service begins.

The Secretary asserts that CCH's SNF was a new and separate "provider" under the relevant Medicare statutes, regulations, and interpretative guidelines, such that it was a "new provider" under PRM § 102.1. Accordingly, the Secretary argues that the SNF's cost-reporting period could not begin before April 1, 1999, after the effective date of PPS (July 1, 1998).[3] CCH, on the other hand, argues that: (1) PRM § 102.1 does not apply because CCH's SNF was a "subprovider" of CCH and not a "new provider"; and (2) even if PRM § 102.1 does apply, other agency manual provisions required CCH to file one cost report for CCH and its SNF covering the same cost-reporting period, which it did.[4]

A. Whether CCH's SNF Was A Provider Or Subprovider

CCH first asserts that a hospital-based SNF is a "subprovider," not a "new provider" under PRM § 102.1, and, thus, the requirements of PRM § 102.1 do not apply. CCH points primarily to Medicare Financial Management Manual § 40.1, arguing that this section explicitly defines a hospital-based SNF as a "subprovider." Section 40.1 states:

> Where an institution certified as a certain type (e.g., hospital, SNF, HHA) has a distinct unit certified as another provider type (e.g., a hospital has a SNF, HHA, or a unit excluded from inpatient

---

[3] The SNF was certified as a Medicare provider in early April 1999 and began operations for cost-reporting purposes shortly thereafter when it saw its first patient on April 10, 1999. Thus, if the SNF was a "new provider" under PRM § 102.1, then the SNF's cost-reporting period began on "the first day of the month in which patient care services begin," or April 1, 1999.

[4] CCH also argues that: (1) the Secretary's decision was arbitrary or capricious because it did not have fair warning of the Secretary's interpretation; and (2) application of the PPS reimbursement methodology to CCH would be an impermissible retroactive application of law. First, CCH waived its fair warning argument by not asserting it until its reply brief. See United States v. Prince, 868 F.2d 1379, 1386 (5th Cir. 1989). Second, CCH's retroactive application of law argument is meritless because it presupposes the correctness of its position on when the SNF's cost-reporting period could begin, and, as we explain in this section, its position regarding this matter is incorrect.

prospective payment system), each such distinct unit (a.k.a. subprovider) is, in effect, another department of the provider. Cost finding in such an institution involves allocation of the institution's costs between the main provider and subproviders (e.g., between the hospital and the SNF, HHA, or excluded unit). Thus, provider complexes with subproviders must file one cost report on the CMS cost reporting forms designated for the main provider . . . . Separate cost reports may not be filed for the provider-based components (subproviders).

(emphasis added). CCH also points to various other provisions requiring a hospital and a hospital-based SNF to submit one cost report–notably 42 C.F.R. § 413.321,[5] PRM § 2414.5,[6] and a PRM transmittal letter addressing cost reporting requirements for an institutional complex[7]–arguing that this requirement undermines the Secretary's treatment of CCH and its SNF as separate providers.

On the other hand, the Secretary asserts, and the district court found, that CCH's SNF was a new and separate "provider" because: (1) the Medicare statutes and regulations specifically list both a hospital and an SNF as a

---

[5]   42 C.F.R. § 413.321 provides in relevant part: "[Hospital-based] SNF's must file a cost report that reflects the shared services and administrative costs of the hospital and any other related facilities in the health care complex."

[6]   PRM § 2414.5 states in relevant part:

Multiple-facility complex providers (hospitals, hospital-based SNF's, and hospital-based HHA's) will use the cost report designated for this type of facility which will provide adequate cost data. Institutions which have multiple facilities but only one provider number, or one provider number [with] subprovider numbers for its related cost entities, are required to submit one cost report under that particular provider number together with the subprovider numbers, if any.

[7]   Trans-Letter, Med-Guide ¶ 151,075 provides in relevant part:

The institution will be required to file one cost report covering the period from the beginning of its reporting period to its regular year-end reporting time. . . . The cost report and supplemental schedules for all components within an institutional complex must be submitted simultaneously and must cover the same cost reporting period.

"provider of services," 42 U.S.C. § 1395x(u); 42 C.F.R. § 400.202;[8] (2) CCH's SNF was certified by CMS as a Medicare provider on April 1, 1999, five years after the hospital was certified as a Medicare provider; (3) the SNF was issued its own unique provider number different from that of the hospital; (4) to participate in the Medicare program, the SNF had to enter into its own agreement with the Secretary, 42 U.S.C. § 1395cc; (5) the SNF must meet certain requirements specified by 42 C.F.R. § 483.1 et seq. pertaining to the provision of services, quality of care, and relationships with other providers, and these requirements are distinct from those for hospitals; and (6) federal Medicare regulations explicitly provide that the SNF, regardless of whether it is part of a larger institution, "is always the entity that participates in the program" for purposes of eligibility, coverage, certification, and payment, 42 C.F.R. § 483.5.

Furthermore, the Secretary argues that CCH's SNF meets the explicit definition of "new provider" under PRM § 102.1, which states that: "A provider . . . is considered to be a new provider upon its entry into the program if it enters the program at the inception of or during its initial business year." CCH's SNF was certified to enter the Medicare program in early April 1999 and rendered its first patient care shortly thereafter on April 10, 1999. According to the Secretary, CCH's SNF thus "entered the program at the inception of or during its initial business year" and was a "new provider" under PRM § 102.1.

We find that there was a sufficient basis for the Secretary's conclusion that CCH's SNF was a new and separate provider subject to PRM § 102.1. Although

---

[8] 42 U.S.C. § 1395x(u) provides: "The term 'provider of services' means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility . . . ." Similarly, 42 C.F.R. § 400.202 states: "Provider means a hospital, a CAH, a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency, or a hospice that has in effect an agreement to participate in Medicare . . . ." Because a hospital-based SNF is an SNF, see 42 U.S.C § 1395i-3 (defining a "skilled nursing facility" as "an institution (or a distinct part of an institution)" which meets certain requirements), a hospital-based SNF is a "provider of services" under the relevant Medicare statutes and regulations.

PRM § 102.1 does not define "provider" or provide any basis for distinguishing between a "provider" and "subprovider," the Medicare statutes explicitly state that an SNF (including one that is a distinct part of an institution) is a "provider of services." See 42 U.S.C. §§ 1395i-3, 1395x(u). This statutory definition, in addition to the fact that the SNF was separately certified and received its own Medicare provider number, provides a reasonable basis for the Secretary's determination. CCH's SNF is, therefore, subject to PRM § 102.1 as a "new provider" because it "enter[ed] the program at the inception of or during its initial business year."

Although CCH presents several reasonable arguments as to why its SNF was a "subprovider," they do not convince us that the Secretary's treatment of the SNF as a "new provider" was arbitrary or capricious. First, to the extent Medicare Financial Management Manual § 40.1 explicitly equates a hospital-based SNF with a subprovider, this manual provision appears to conflict with the statutory language defining a hospital-based SNF as a "provider of services," and the statutory language prevails. See Sta-Home Home Health Agency, Inc. v. Shalala, 34 F.3d 305, 310 n.11 (5th Cir. 1994) ("[T]he PRM does not carry the force and effect of law . . . and certainly does not displace a reasonable statutory interpretation.") (citation omitted). Second, several PRM provisions distinguish between hospital-based SNF's and "subproviders," thereby further undermining CCH's reliance on Medicare Financial Management Manual § 40.1. See PRM § 112 ("Hospitals which have subproviders and hospital-based SNF's . . . ."); PRM § 3622 ("Complete a separate copy of the worksheet for the hospital, each subprovider, hospital-based SNF, and hospital-based other nursing facility."). Finally, the mere fact that several Medicare manual provisions require CCH and its SNF to file one cost report does not make the SNF a "subprovider," as the purpose of that requirement is simply convenience and efficiency. See Cmty. Care Hosp., Review of: PRRB Dec. No. 2005-D30, at 6-7 n.4 ("A purpose of the

multiple complex cost report is to ensure the appropriate allocation of costs between the various component[s] for shared services and administrative costs . . . .").

B. Whether CCH Was Required To File One Cost Report For CCH And Its SNF Covering The Same Cost-Reporting Period

CCH's second argument is that even if its SNF was not a subprovider, it was required to file one cost report for CCH and its SNF and was bound by CCH's cost-reporting period. To support its argument, CCH again points to 42 C.F.R. § 413.321, Medicare Financial Management Manual § 40.1, PRM § 2414.5, and the PRM transmittal letter addressing cost-reporting requirements for an institutional complex. CCH's argument, however, is unpersuasive.

Even if the cited provisions do require a hospital and its SNF to file one cost report covering the same cost-reporting period,[9] PRM § 102.1 reasonably can be read to modify that requirement in the case of a "new provider"–that is, although a hospital and hospital-based SNF generally file one cost report covering the same period, in instances in which the hospital-based SNF is a "new provider," PRM § 102.1 may require that the beginning of the cost-reporting year for the SNF differ from that of the hospital.[10] Alternatively, as the Secretary argues, CCH and its SNF could have filed one cost report sharing the same period by simply reducing the hospital's prior cost-reporting period to twelve months, from April 1, 1998 to March 31, 1999, such that the required beginning date of its SNF cost report under PRM § 102.1 and the beginning date of the

---

[9] It should be noted that only the PRM transmittal letter explicitly requires all components of an institutional complex to share the same cost-reporting period.

[10] In this event, CCH and its SNF would ostensibly still file one cost report, but the beginning of the cost-reporting period for the SNF would be different from that of the hospital. In such an event, as the Secretary explained in his decision, "[t]he costs stepped down to the hospital-based SNF pursuant to the multiple facility cost report would be consistent with its short cost reporting period and not reflect 13 months of costs." Cmty. Care Hosp., Review of: PRRB Dec. No. 2005-D30, at 6-7 n.4.

hospital cost report would be the same (April 1, 1999). Thus, the requirements of PRM § 102.1 and the provisions cited by CCH requiring one cost report can be reasonably harmonized.[11] The Secretary's decision, therefore, was not arbitrary or capricious.

## IV.

We recognize that CCH is frustrated by the conflicting decisions arrived at by the Secretary, the PRRB, CMS, and its fiscal intermediary regarding the cost-reporting period of its SNF. Such conflicting positions at different levels within the administrative agency, however, simply reflect the agency's adjudicative process at work. More importantly, we may only review the ultimate decision of the Secretary, which is "issued only after a case has progressed through all the levels of administrative review." RenCare, Ltd. v. Humana Health Plan of Tex., Inc., 395 F.3d 555, 557 (5th Cir. 2004). Because, as explained above, the Secretary's final decision was not arbitrary or capricious, the order of the district court is

AFFIRMED.

---

[11] Of course, another reasonable way to harmonize these provisions is by interpreting PRM § 102.1 to not apply to "new providers" that are hospital-based SNF's. The Secretary, however, did not adopt this interpretation, but rather a different reasonable interpretation, which should be given deference. Even if we agree with CCH that the Secretary's interpretation is only "entitled to respect" under Skidmore v. Swift & Co., 323 U.S. 134 (1944), given that the Secretary's interpretation is reasonable and consistent with statutory and regulatory requirements, and given that we are dealing with "a complex and highly technical regulatory program," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotations omitted), this Court accords deference to the Secretary's interpretation. Contrary to CCH's assertions, such deference would not impermissibly allow the Secretary to create a de facto regulation. See Christensen v. Harris County, 529 U.S. 576, 588 (2000) (asserting that deference to the agency's interpretation would impermissibly allow it to create a de facto regulation where the agency was "[s]eeking to overcome the regulation's obvious meaning") (emphasis added).