RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ATRIUM MEDICAL CENTER, et al.,

        *Plaintiffs-Appellants,*

    *v.*

No. 13-3288

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

        *Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati
No. 1:12-cv-00089—Sandra S. Beckwith, District Judge.

Argued: December 5, 2013

Decided and Filed: September 8, 2014

Before: McKEAGUE and STRANCH, Circuit Judges; COLLIER, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Keith D. Barber, HALL RENDER KILLIAN HEATH & LYMAN, P.C., Indianapolis, Indiana, for Appellants. Brett Bierer, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Baltimore, Maryland, for Appellees. **ON BRIEF:** Keith D. Barber, N. Kent Smith, HALL RENDER KILLIAN HEATH & LYMAN, P.C., Indianapolis, Indiana, for Appellants. Brett Bierer, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Baltimore, Maryland, for Appellees.

    STRANCH, J., delivered the opinion of the court, in which COLLIER, D.J., joined, and McKEAGUE, J., joined in the result. McKEAGUE, J. (pg. 19), delivered a separate opinion concurring in the judgment.

─────────────────

[*]The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

---

**OPINION**

---

STRANCH, Circuit Judge.　Two groups of hospitals, one in the Cincinnati area and the other in rural Iowa, challenged the Secretary of Health and Human Services' calculation of how much to pay those hospitals for inpatient services under Medicare Part A.　The hospitals objected to the Secretary's decision to include in the calculation the hours associated with two types of programs: a short-term disability program paid from a hospital's general funds through its payroll system and a program offering a full-time salary for part-time weekend work.　The district court entered summary judgment for the Secretary.　We **AFFIRM**.

## I.　BACKGROUND

This is a Medicare case, which requires us to grapple with some of "the most completely impenetrable texts within human experience," statutes and regulations that "one approaches . . . at the level of specificity herein demanded with dread." *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994).　The slim hope of rendering a comprehensible opinion counsels us to begin with an overview of the Medicare reimbursement program as it pertains to this dispute.

### A.　The Wage Index: Statutory and Regulatory Framework

Under Medicare Part A, hospitals are reimbursed for inpatient medical services according to a fixed, predetermined formula called the prospective payment system (PPS).　The PPS is complicated, but the relevant portion of it is relatively straightforward.　The Medicare Act (Title XVIII of the Social Security Act) requires the Secretary to adjust reimbursements to account for any differences in the cost of labor in a given area.　Section 1886(d)(3)(E)(i) provides:

> the Secretary shall adjust the *proportion*, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to *wages* and *wage-related costs*, of the . . . prospective payment rates . . . for area differences in hospital wage levels by a *factor* (established by the Secretary) reflecting the relative hospital *wage level* in the geographic area of the hospital compared to the national average hospital wage level.

42 U.S.C. § 1395ww(d)(3)(E)(i) (emphasis added).  The Center for Medicare and Medicaid Services (CMS) determines the hospitals' labor costs by examining, through a fiscal intermediary, yearly reports submitted by the hospitals.  42 C.F.R. § 413.24.  The reporting process is complex, and CMS maintains a Provider Reimbursement Manual (PRM) derived from 42 C.F.R. § 413.24 and based on Generally Accepted Accounting Principles that provides step-by-step guidance on how to report costs.  The rulemaking announcing the wage index specifically references and incorporates the relevant sections of the PRM.  *See, e.g.*, 73 Fed. Reg. 48434, 48581–48582 (Aug. 19, 2008).

CMS aggregates the reported data to determine both the "proportion"—the average cost of labor of all hospitals nationwide—and the "factor"—the average cost of labor in a given area—both expressed as an average hourly wage; the "factor" is what CMS refers to as the wage index.  The D.C. Circuit, in *Methodist Hospital of Sacramento v. Shalala*, provides a good description of the process:

> The wage index reflects a [statutory] requirement . . . that the federal rate be adjusted to reflect geographic variations in labor costs.  The area wage indexes for each region are based on wage-cost data periodically submitted by Medicare hospitals across the country. The indexes are used at two points in the prospective payment rate calculation.  First, regional wage indexes are used (along with other factors, such as inflation and hospital case-mix ratios) to modify and standardize the data used to establish the nationwide "federal rate."  Second, once the federal rate has been set, the wage indexes are used to make regional adjustments to the labor-related portion of the federal rate.  Because each wage index is used to develop the base national rate as well as to adjust that rate by region, a change in any single wage index can affect the reimbursement rate of each hospital in the country.

38 F.3d 1225, 1227–28 (D.C. Cir. 1994) (citations omitted).  In addition, the total national amount of reimbursements is fixed; the wage indices determine how the pie is divided but cannot alter the size of the pie itself.  42 U.S.C. § 1395ww(d)(3)(D).

The wage index has three components: "wages," "paid hours," and "wage-related costs," all of which are reported pursuant to the PRM.  "Wages" are determined by taking the dollar value of every hour the hospital paid its employees.  "Paid hours" are the actual hours associated with an employee's wages rather than simply the amount of time an employee spent working at the hospital; for example, paid hours includes "paid lunch hours" and "paid holiday, vacation,

and sick leave hours."  PRM § 3605.2; *see also Adventist GlenOaks Hosp. v. Sebelius*, 663 F.3d 939, 942 (7th Cir. 2011).  "Wage-related costs" are essentially fringe benefits, like health insurance and retirement plans, and are not linked to paid hours.  *See* 59 Fed. Reg. 45330, 45356–57 (Sept. 1, 1994); *see also* 73 Fed. Reg. at 48581–48582.  So, under this "paid hours" approach to determining wages, paid time off (PTO) like paid sick time, paid vacation, and paid lunch time are all accounted for as wages (e.g., the dollar value of the amount of paid sick leave an employee took) and paid hours (e.g., the amount of time the employee was out sick).

To understand why these categories matter, consider a simplified version of the formula used to calculate a region's index:  (wages + wage-related costs)/(paid hours).  *See* 68 Fed. Reg. 45346, 45396–45397 (Aug. 1, 2003); *see also* 58 Fed. Reg. 46270, 46299 (Sept. 1, 1993); 73 Fed. Reg. at 48582–83.  Note that paid hours are in the denominator:  The more paid hours a hospital has to report, the lower its region's index; the lower the index, the less money the hospital makes from inpatient services.  A given hospital (or group of hospitals in the same region) would therefore prefer to report as few paid hours as possible.  One way to do this is to treat something as a "wage-related" cost rather than a "wage" cost because only wage costs are tied to paid hours.  At the very least, the hospital would not want to report something as a "wage" that hospitals in other regions report as "wage-related" because it would lower that hospital's index in comparison.  Both disputes in this case involve this kind of classification issue.

## II.  JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.  The Secretary's decision[1] is reviewed de novo.  *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 408 (6th Cir. 2007).  The Administrative Procedure Act governs the scope and substance of our review of the Secretary's actions.  5 U.S.C. §§ 701–706.  If, as here, the Secretary's decision depends in part on her construction of the Medicare Act, we determine what level of deference to afford the Secretary's construction and then whether the Secretary exceeded her "statutory . . . authority."  *Id.*

---

[1]The Secretary has delegated review of Medicare Part A reimbursement decisions to the Administrator of CMS.  42 C.F.R. § 405.1875; *see also* 73 Fed. Reg. 30190, 30191 (May 23, 2008).

§ 706(2)(C).  And we evaluate the Secretary's reasoning to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

### A.  Statutory Interpretation: *Chevron* and *Skidmore*

The parties agree that the Secretary's interpretation of the wage index involves a question of statutory interpretation under the rule of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44 (1984), rather than the less-deferential rule of *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Practically speaking, "in cases such as those involving Medicare or Medicaid, in which CMS, 'a highly expert agency[,] administers a large complex regulatory scheme in cooperation with many other institutional actors, the various possible standards for deference'—namely, *Chevron* and *Skidmore*—'begin to converge.'"  *Estate of Landers v. Leavitt*, 545 F.3d 98, 107 (2d Cir. 2008) (quoting *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002)).  There are, however, real differences between the two standards.

*Chevron* and its related cases provide a two-step framework to resolve questions of statutory construction when they arise in the administrative context.  *See* 5 U.S.C. §§ 706(2)(A), (C).  The court first determines whether "Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  If the court can discern "the unambiguously expressed intent of Congress," then that construction of the statute controls.  *Id.* at 843.  But if the statute is ambiguous on the precise question at issue, the court must next determine whether Congress has either expressly or implicitly delegated authority to the agency to fill the gap—that is, to "elucidate a specific provision of the statute by regulation."  *Id.* at 843–44.  If the delegation is express, the agency's "legislative regulations" made pursuant to that delegation "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 844.  If, however, the delegation is implicit, the court's review is somewhat less deferential: "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the Administrator of an agency."  *Id.*

But *Chevron* only applies if "Congress delegated authority to the agency generally to make rules carrying the force of law" *and* the agency interpretation was "promulgated in the exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).  The

interpretation merits less deference if the agency's action was not promulgated in the exercise of that authority and was simply another kind of "interpretive choice" that an agency must "necessarily make" when applying a statute. *Id.* at 227–28. Generally, "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law" and were not promulgated via notice and comment rulemaking, "do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty*, 529 U.S. 576, 587 (2000); *see also Mead*, 533 U.S. at 234. Rather, such interpretations are normally "'entitled to respect' . . . but only to the extent that [they] have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "In deciding whether the Secretary's interpretation is persuasive, 'we look to the statute's text and design,' including whether the regulation is 'consistent with congressional purpose.'" *S. Rehab. Grp., P.L.L.C v. Sec'y of HHS*, 732 F.3d 670, 685 (6th Cir. 2013) (citations omitted).

The fact that an interpretation was "reached . . . through means less formal than 'notice and comment rulemaking' does not automatically deprive that interpretation" of *Chevron* deference. *Barnhart v. Walton*, 535 U.S. 212, 221 (2002) (citation omitted). Instead, *Chevron* deference "depends in significant part upon the interpretive method used and the nature of the question at issue." *Id.* at 222 (citing *Mead*, 533 U.S. at 229–231). The court should consider "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration," and the degree to which the Agency has given "careful consideration" to the question "over a long period of time." *Id.* The degree of deference is essentially a question of congressional intent coupled with the agency's mode of decisionmaking. *Mead*, 533 U.S. at 230 n.11; *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 397 (D.C. Cir. 2011).

## B. Arbitrary and Capricious Review

Even if an agency's statutory interpretation is permissible under *Chevron* or *Skidmore*, the agency's action may still be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Not only must an agency's decreed result be within the scope of its lawful authority but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). At

base, arbitrary and capricious review functions to "ensur[e] that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 132 S.Ct. 476, 484 (2011). A reviewing court will examine the agency's decision to determine if it

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The standard of review is "narrow," *id.*, and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). Nevertheless, the agency's reasoning must be "both discernible and defensible." *Cleveland Cliffs Iron Co. v. ICC*, 664 F.2d 568, 580 (6th Cir. 1981). "The ground upon which an administrative order must be judged are those upon which the record discloses that its action was based," *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943), and an agency cannot bolster its case with rationales offered post hoc. *See Columbus & S. Ohio Elec. Co. v. Costle*, 638 F.2d 910, 912 (6th Cir. 1980); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 ("The courts may not accept appellate counsel's post hoc rationalizations . . . ."). By the same reasoning, "[a]n agency reaffirming its long-standing policy need not analyze all aspects of that policy as if adopting it for the first time, but rather must only consider specific objections made to its continuation of that policy." *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 176 (2d Cir. 2006).

Our review of an agency's interpretation of its own regulations—as opposed to the authorizing statute—also falls under section 706(2)(A). *Allentown Mack*, 522 U.S. at 377 (1998). The standard is especially deferential: the agency's interpretation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989) (internal quotation marks omitted)). This circuit, among others, has long held that *Auer* deference (also sometimes called *Seminole Rock* deference after *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)) is "especially [applicable] in areas like Medicare reimbursements" given the technical complexity of the reimbursement regime. *Univ. of*

*Cincinnati v. Heckler*, 733 F.2d 1171, 1174 (6th Cir. 1984) (collecting cases from other circuits). The Supreme Court is in accord, noting that, in the Medicare context, "broad deference is all the more warranted when, as here the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).

### III.  ANALYSIS

### A.  The Statutory Mandate

Section 1395ww(d)(3)(E) expressly delegates substantial authority to the Secretary to determine the composition of the wage index—Congress empowered the Secretary to "estimate[]" the proportion of labor costs and "establish[]" the wage index.  The legislative history confirms that Congress intended to grant the Secretary exceptionally broad discretion to determine the wage index—the relevant conference report simply stated that "[n]o particular methodology for developing the indices is specified."  H.R. Rep. No. 100-495, at 521 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313–1245, 2313–1267.  Indeed, the statute "defines neither 'wages' nor 'wage-related,'" instead allowing the Secretary to define and apply those terms. *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 917 (D.C. Cir. 2009).  Pursuant to *Chevron*, this broad, express delegation means that the Secretary's interpretation of section 1395ww(d)(3)(E) should be upheld unless it is "manifestly contrary to the statute" and as long as the interpretation is promulgated in a manner that is actually eligible for *Chevron* deference.  467 U.S. at 844.

Although section 1395ww(d)(3)(E) grants the Secretary substantial discretion, the statute does betray a few relevant guiding principles.  The language's consistent use of the singular—"the proportion" and "a factor"—indicates that the wage index must be uniformly determined and applied. *See Sarasota Mem'l Hosp. v. Shalala*, 60 F.3d 1507, 1513 (11th Cir. 1995) (stating that § 1395ww(d)(3)(E) requires both a "uniform picture" of wage levels and "a uniform index").  Further, and not to belabor the obvious, the index must in fact encompass only "wages and wage-related costs" and must reasonably "reflect the relative hospital wage level" in a given area. *Id*. at 512.  The statute, however, does not mandate exactitude; the Secretary need only "estimate[]"

the proportion of labor costs and the resulting wage index need only "reflect" the relative area wage levels. *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1230 (D.C. Cir. 1994) (noting that "at any given time the wage index must reflect the Secretary's best approximation of relative regional wage variations" and rejecting a construction that would preclude "reasonable approximations" of relative wage levels). Nor does the statute mandate any specific distinction between "wage" and "wage-related" costs. *Se. Ala. Med. Ctr.*, 572 F.3d at 917. Overall, the wage index must simply "reflect[]" relative wage levels across the country.

The crucial consideration is that, whatever definitions the Secretary employs, she applies them consistently in order to avoid distorting the wage index. In other words, section 1395ww(d)(3)(E) precludes the Secretary from treating different types of costs as the same or the same type of cost differently for different hospitals. The parties highlight two cases, *Sarasota Memorial Hospital v. Shalala*, 60 F.3d 1507 (11th Cir. 1995), and *Adventist GlenOaks Hospital v. Sebelius*, 663 F.3d 939 (7th Cir. 2011), both decided under section 706(2)(A) of the APA, that explicate this uniformity principle.

In *Sarasota*, a hospital switched from withholding the employee portion of FICA taxes from its employees' paychecks to actually paying the taxes itself. At the time, the wage index did not include fringe benefits; the Secretary concluded that although the previously *withheld* taxes were part of the wage index, the *paid* taxes were not because they were fringe benefits. The Eleventh Circuit held that this distinction was "inconsistent with the mandate of the Medicare statute requiring a uniform wage index" because the Secretary was arbitrarily "classifying the same FICA payments as wages when deducted from an employee's gross pay, but as fringe benefits when paid directly by the employer." *Sarasota*, 60 F.3d at 1513.

In *Adventist*, a number of hospitals that gave their employees a paid lunch hour challenged CMS's decision to include those hours as "paid leave" in the wage index; because most hospitals did not provide paid lunch time, the argument went, the wage index was distorted by including some hospitals' lunch time but not others. The Seventh Circuit rejected this challenge, holding that the paid hours approach, although not perfectly accurate, was permissible as a "bright-line rule that is comparatively easy to administer" and that paid lunch hours were properly considered as paid hours. *Adventist*, 663 F.3d at 945.

Both cases underscore the nature of the Secretary's mandate under section 1395ww(d)(3)(E). *Adventist* exemplifies the breadth of the Secretary's discretion in formulating the wage index to "reflect" relative wage levels: the Medicare Act allows the Secretary to sacrifice complete accuracy for "administrative simplicity." 663 F.3d at 943. But *Sarasota* teaches that even a less than perfect wage index must still be consistently and uniformly applied. 60 F.3d at 1513. The other cases that have addressed the wage index support the principle that the Secretary has broad discretion to formulate the wage index, *see, e.g.*, *Se. Ala. Med. Ctr.*, 572 F.3d at 918–919; *Methodist Hosp. of Sacramento*, 38 F.3d at 1230, as long as she does not arbitrarily treat the same input differently for different hospitals, *see, e.g.*, *Centra Health, Inc. v. Shalala*, 102 F.Supp.2d 654, 660 (W.D. Va. 2000).

It is with these principles in mind that we turn to the Secretary's decision. The Secretary confronted two distinct issues; one dealt with short-term disability payments, the other with weekend work. We address each in turn.

## B. The Secretary's Decision: Short-Term Disability

Most hospitals either buy insurance or self-insure to cover short-term disability payments; in either case, CMS treats the associated costs (e.g., insurance premiums) as "wage-related" costs. *See* PRM § 15-1-2161 (third party insurance); *id.* at § 15-1-2162.7 (self-insurance); *see also* 60 Fed. Reg. 33126, 33131 (June 27, 1995) ("the Provider Reimbursement Manual sets forth stringent criteria that must be met in order to gain program recognition as a self-insurance fund"). However, some hospitals—including at least one of the plaintiffs—choose to forgo insurance and simply pay short-term disability out of general funds and through the payroll process. Pursuant to the PRM, CMS treats these costs as "paid time off"—and therefore "wages"—and requires hospitals to report the corresponding hours of short-term disability leave as "paid hours." Those hospitals (and any other hospital in the same geographic area) would, of course, prefer to have their short-term disability payments treated as "wage-related" costs even though they are part of the payroll: Their wage indices would increase because they would not have to report any associated hours.

The plaintiff hospitals objected to CMS's distinction, which they characterized as "inconsistent treatment of costs related to short term disability." According to the hospitals, the

associated hours recorded in their payroll systems "were not 'paid hours' in any true sense but rather hours merely used for accounting purposes to calculate the appropriate short-term disability payment to the employee." Thus, the hospitals argued, because paying short-term disability from general funds through payroll was essentially the same as purchasing short-term disability insurance, CMS was required to treat the two types of short-term disability programs the same way—as "wage-related" costs. To do otherwise would violate the Medicare Act's mandate that the wage index be uniform and consistent.

The Secretary rejected the hospital's argument. She based her decision on the PRM, noting that because the hospital's short-term disability plan "is not properly considered an insurance cost" under either PRM § 15-1-2161 (third party insurance) or PRM § 15-1-2162.7 (self-insurance), "the hours and costs attributable to employees must be considered paid time off." The Secretary also noted that treating the hospital's self-funded program as paid time off "is consistent with other cases" involving similar short-term disability programs and that there was no evidence that *any* similarly-situated hospital had been treated differently. The Secretary concluded that "a distortion to the wage index would occur if St. Elizabeth's [i.e., a representative plaintiff-hospital] direct payment of short-term disability was handled differently from other hospitals that chose the same payment method."

### 1. CMS's Interpretation of the Medicare Act

CMS's interpretation of whether, under the Medicare Act, short-term disability paid from general funds via payroll may be classified as a "wage" rather than a "wage-related cost," and whether such a classification "properly captures 'the relevant hospital wage level,'" *Adventist*, 663 F.3d at 943, originates in the PRM and not a portion of the Code of Federal Regulations or a statement published in the Federal Register. The PRM's foreword states that "[t]he provisions of the law and the regulations are accurately reflected in this manual, but it does not have the effect of regulations." PRM, Foreword I. As a whole, the PRM, which was first promulgated a number of years before Congress made Medicare subject to the APA, has never been published in the Federal Register or directly made subject to notice-and-comment rulemaking per section 553 of the APA. The Supreme Court has held that section 223 of the PRM—which is not at

issue in this case—"is a prototypical example of an interpretive rule" that "do[es] not have the force and effect of law." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995).

Some courts have thus held that interpretations in the PRM merit only *Skidmore* deference. *See, e.g.*, *Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 73 (1st Cir. 2006); *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 791 (9th Cir. 2003); *Estate of Landers*, 545 F.3d at 107. As the D.C. Circuit has noted, "agency manuals" are generally considered "an archetype of the kind of document that is not entitled to [*Chevron*] deference." *Public Citizen, Inc. v. U.S. Dep't of HHS*, 332 F.3d 654, 660 (D.C. Cir. 2003). However, a number of courts have applied *Chevron* deference to portions of the PRM. *See Shalala v. St. Paul-Ramsey Medical Cntr.*, 50 F.3d 522, 527 (8th Cir. 1995); *Cnty. of Los Angeles v. Leavitt*, 521 F.3d 1073, 1078 (9th Cir. 2008); *Cmty. Care, LLC v. Leavitt*, 537 F.3d 546, 551 n.11 (5th Cir. 2008); *Mercy Home Health v. Leavitt*, 436 F.3d 370, 377 (3rd Cir. 2006). And the Seventh Circuit has long held that the PRM "is 'entitled to considerable deference'" without specifying whether *Chevron* or *Skidmore* applies. *Daviess Cnty. Hosp. v. Bowen*, 811 F.2d 338, 345 (7th Cir. 1987) (quoting *Bedford Med. Ctr. v. Heckler*, 766 F.2d 321, 323 (7th Cir. 1985); *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 542 (7th Cir. 2012) (citing *Daviess Cnty.*). Further, in *Adventist*, the Seventh Circuit applied *Chevron* deference to the Secretary's decision to include paid lunch hours in the wage index. *Adventist*, 663 F.3d at 942, 945. And practically speaking, the Seventh Circuit is correct—courts tend to defer to statutory interpretations found in the PRM regardless of which rule they apply. *See, e.g, Estate of Landers*, 545 F.3d at 107.

This circuit has not squarely addressed the level of deference to afford the portions of the PRM that apply to the wage index. Some of our cases could be read to indicate that *Skidmore* applies to the PRM as a whole. For example, there is language in *Battle Creek Health System v. Leavitt*, suggesting that the PRM is entitled to only *Skidmore* deference. 498 F.3d at 409. But *Battle Creek* dealt with the PRM's interpretation of a portion of the Code of Federal Regulations rather than a statute, and so actually dealt with *Auer* deference rather than *Chevron* or *Skidmore*. *Clark Regional Medical Center v. HHS*, 314 F.3d 241 (6th Cir. 2002), which *Battle Creek* cites, also dealt with an interpretation of the Code of Federal Regulations rather than the underlying

statute. *See id.* at 245–46. But in at least one instance our court has applied *Chevron*-style deference to a section of the PRM, holding that "the interpretation of the . . . statute in the PRM is *reasonable*." *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 945 (6th Cir. 2000) (emphasis added). Our cases are not in conflict. Rather, taken together, they instruct us to avoid unreliable shortcuts—such as whether a regulation has the word "manual" in its title—and instead evaluate each portion of the PRM on its own terms and circumstances. *See Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 732 (6th Cir. 2013) (Sutton, J., concurring) ("All kinds of administrative documents, ranging from manuals to opinion letters, sometimes receive *Chevron* deference.").

A number of things distinguish the portions of the PRM used in the wage index from a prototypical *Chevron*-unworthy agency document. First and foremost, CMS's rulemaking announcing the wage index specifically incorporates the relevant sections of the PRM. *See, e.g.*, 73 Fed. Reg. 48434, 48581–48582. Second, the agency solicits and receives comments on those sections via the APA's notice and comment process, *see, e.g.*, 68 Fed. Reg. at 45396, and announces changes via the same process, *see, e.g.*, 66 Fed. Reg. 39859 (Aug. 1, 2001). Although the actual text of this portion of the PRM is not published in the Federal Register and the manual itself is therefore not a "substantive rule," *see* 5 U.S.C. § 553(d), it functions as an essential part of the wage index. *Barnhart* instructs that *Chevron* deference "depends in significant part upon the *interpretive method used* and the nature of the question at issue." 535 U.S at 222. (citing *Mead*, 533 U.S. at 229–231) (emphasis added). That the portions of the PRM used in the wage index are effectively subject to notice and comment procedures should tend towards applying *Chevron* rather than *Skidmore*. *Cf. Mead*, 533 U.S. at 230.

*Barnhart* further instructs the court to consider "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to the administration of the statute, the complexity of that administration," and the degree to which the Agency has given "careful consideration" to the question "over a long period of time." 535 U.S. at 222. The issue here—whether to treat short-term disability payments made from general funds via payroll as wages or wage-related costs—is manifestly interstitial, as it involves determining the functional distinction between "wage" and "wage-related" costs, terms that the

Medicare Act does not define and the common definitions of which, the D.C. Circuit has noted, substantially overlap. *See Se. Ala. Med. Ctr.*, 572 F.3d at 917 (noting that "some dictionaries define 'wage,' itself, to include fringe benefits"). The resolution of the question speaks directly to CMS's expertise in maintaining the wage index and classifying costs in a manner that comports with the realities of the business of providing healthcare. The question is not crucial— it does not affect a great number of hospitals—but a consistent and accurate accounting of these kind of costs is undoubtedly necessary to maintain the integrity of the wage index. And CMS has carefully considered the composition and administration of the wage index for a long, long time. The PRM as it relates to the wage index should receive *Chevron* deference—the relevant sections are "rules carrying the force of law." *Mead*, 533 U.S. at 227.

Further, *Chevron* deference comports with the exceptional breadth of Congress's delegation to the Secretary to establish and administer the wage index—section 1395ww(d)(3)(E)(i) grants the Secretary broad power to speak with the force of law in promulgating the wage index. In *Barnhart*, the Court stated that

> the statute's complexity, the vast number of claims that it engenders, and the consequent need for agency expertise and administrative experience lead us to read the statute as delegating to the Agency considerable authority to fill in, through interpretation, matters of detail related to its administration. The interpretation at issue here is such a matter.

535 U.S. at 225. The same analysis applies here.

Recently, in *Southern Rehabilitation Group, P.L.L.C. v. Secretary of HHS*, we applied *Skidmore* deference to the Medicare Claims Processing Manual promulgated by CMS to address fee-for-service claims, which is not at issue in this case. 732 F.3d at 685. Applying *Chevron* to the sections of the PRM used in the wage index is consistent with *Southern Rehabilitation Group's* application of *Skidmore* to the Claims Processing Manual. The relevant statutory provision in *Southern Rehabilitation Group* was far more specific than section 1395ww(d)(3)(E)(i). *Id.* at 684. Consequently, the statutory issue was not "interstitial" per *Barnhart*; rather than fill in gaps left by Congress, the Claims Processing Manual was an attempt to interpret the statute in a manner inconsistent with Congress's "express language." *Id.* at 685. The relevant sections of the PRM, in contrast, simply address the interstices between "wage" and

"wage-related." And, unlike the relevant sections of the PRM, it appears that the relevant sections of the Claims Processing Manual were neither incorporated by reference in an attendant rulemaking nor otherwise made subject to notice, comment, and revision via the Federal Register. *Id.* The differences between this case and *Southern Rehabilitation Group* are instructive—taken together, they provide useful guidance on when to apply *Skidmore* and when to apply *Chevron*.

Because *Barnhart* directs us to apply *Chevron*, our analysis of the Secretary's statutory interpretation is relatively simple: CMS's treatment of non-insurance short-term disability programs is simply not "manifestly contrary" to section 1395ww(d)(3)(E)(i). *Henry Ford Health Sys. v. Dep't of HHS*, 654 F.3d 660, 666 (6th Cir. 2011). CMS treats insurance programs differently from non-insurance programs, even if those programs purport to provide the same types of benefits, because they are in fact different; and section 1395ww(d)(3)(E)(i)'s broad delegation and ambiguous terms certainly permit such a distinction. We therefore hold that the Medicare Act allows (but does not require) CMS to treat an insurance premium as a "wage-related cost" and a disability payment made from general funds and keyed to an employee's base salary as a "wage" for which hours must be reported.**[2]**

## 2. The Secretary's Reasoning

The Secretary also based her decision on her interpretation of the relevant sections of the PRM, and that portion of her decision merits *Auer* deference: it is "controlling unless 'plainly erroneous or inconsistent with the regulation,'" which it is not. 519 U.S. at 461. Pursuant to Generally Accepted Accounting Principles, the PRM treats payroll practices differently from insurance programs, and the short-term disability program at issue was not insurance. The hospitals argue that CMS's treatment of short-term disability programs is analogous to the FICA

---

**[2]**Our conclusion would be the same even if we applied only *Skidmore* deference. *Skidmore* counsels courts to consider "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. The Secretary's decision represents a consistent application of the paid hours approach to labor costs that are paid out of general funds via payroll; it draws a valid distinction between insurance and non-insurance programs; and is part of a thoroughly considered wage index. "As the administrative actor charged with enforcing the Act," the Secretary is "'in the best position' to develop 'historical familiarity and policymaking expertise' in applying" section 1395ww(d)(3)(E)(i). *Chao v. Occupational Safety & Health Rev. Comm'n*, 540 F.3d 519, 527 (6th Cir. 2008) (quoting *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 228 (2d Cir. 2002)).

taxes in *Sarasota*. We disagree. *Sarasota* dealt with two methods of making "the same payments." *Sarasota*, 60 F.3d at 1513. At issue here are two very different kinds of payments—an insurance premium and a direct payment from general funds. The PRM reasonably distinguishes between the two, and we defer to this interpretation of "'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Thomas Jefferson Univ.*, 512 U.S. at 512 (1994).

### C.  The Secretary's Decision: Baylor Plan Hours

Many hospitals incentivize weekend work by offering a full-time salary and accompanying benefits for two weekend shifts. This arrangement, called the "Baylor Plan" after the hospital that first introduced it, is widely used—an employee on the Baylor plan might, for example, work two 12-hour weekend shifts and be paid as a full-time employee so that the hospital's payroll would record 40 paid hours per week. The question is how to count those un-worked hours in the wage index. CMS treats those hours as "paid hours" but a given hospital would prefer to count only the hours in an employee's weekend shifts and treat the un-worked hours as nothing more than a mechanism for recording the premium it pays the employee for working on the weekends. A hospital's payroll system may record the "hours" associated with the premium, but bonuses are often recorded the same way—that is, the payroll system might record a bonus of $x$ dollars as the total of $y$ hours of the employee's hourly wage—and those bonus hours are not included in the wage index. Similarly, a typical payroll system might record overtime, for which an employee is paid time-and-a-half, by multiplying the number of overtime hours the employee worked by 1.5 (rather than multiplying the employee's hourly wage by 1.5) so that, for example, an employee's one hour of overtime might be recorded as 1.5 hours. CMS allows the hospitals to subtract the resulting "phantom hours." *See* PRM § 3605.2 ("[N]o hours are required for bonus pay.").

The plaintiff hospitals argued that the unworked Baylor hours should be treated like the phantom hours associated with bonus pay and overtime. The unworked Baylor hours "were not 'paid hours' in any sense of the word," the hospitals argued, "but merely an accounting mechanism to calculate a premium per hour incentive for employees who work undesirable

shifts." The hospitals argued that the unworked hours were "bonus pay" pursuant to PRM § 15-2-3605.2 and that a contrary conclusion would violate the Medicare Act because the wage index would not reflect the "true per hour costs of paying employees for working undesirable shifts."

> In rejecting the hospitals' argument, the Secretary noted that

> it has been CMS' longstanding policy to use paid hours rather than hours worked for calculating the wage index, because paid hours more appropriately reflect the basis of a salary, which includes paid leave as well as any non-productive time for which the employee receives a salary. The Administrator notes that the importance of using paid hours rather than hours actually worked is especially important for the Baylor Plan Hours, since part of the reason the additional hours are recorded is that it allows the employee to receive benefits, something to which a part time employee would not be entitled.

(R. 34-1, Page ID 312.) The Secretary also noted that "Baylor Plan hours at all hospitals are treated in a similar manner," and the wage index would be distorted if CMS treated the plaintiff-hospitals' Baylor Hours differently than other hospitals.

The question of how to treat the unworked Baylor hours is not one of statutory construction; *Auer*, rather than *Chevron* or *Skidmore*, applies here. There is no question that the Medicare Act authorizes the Secretary to create a wage index, there is no dispute that the statute permits the Administer to adopt the "paid hours" methodology, there is no question that the costs at issue here are properly—indeed, must be—included in the wage index, and there is no contention that CMS is treating these hospitals' Baylor hours any differently from any others. *See Nat'l Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 668 (6th Cir. 2013). Instead, the hospitals are really arguing that counting the unworked hours violated the *regulations* establishing and implementing the wage index—they want CMS to apply a different section of the PRM and treat the hours like bonuses and overtime.

The Secretary interpreted the "paid hours" approach to the wage index to permit CMS to count all Baylor hours as paid hours. This interpretation is certainly consistent with the regulation and should be afforded *Auer* deference, especially given that the interpretation comports with the reality of the Baylor plan: as both the Secretary and the district court noted, the hospitals themselves treat their Baylor plan employees as full time employees, not highly-

paid part-timers.  It is neither arbitrary nor capricious to include all the Baylor plan hours in the wage index. *Cf. Adventist*, 663 F.3d at 943–45.

## IV.  CONCLUSION

"Having wound our way through the intricate tangle of" factors, proportions, wages, wage-related costs, paid hours, short-term disability payments, and Baylor hours, we hold that the Secretary's construction of the Medicare Act was not manifestly contrary to the statute and that her reasoning was neither arbitrary nor capricious. *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 17 (D.C. Cir. 2011).  We AFFIRM the district court's grant of summary judgment for the Department of Health and Human Services.

---

## CONCURRENCE IN THE JUDGMENT

---

McKEAGUE, Circuit Judge, concurring in the judgment.  I agree with the majority that the PRM's treatment of short-term disability paid from general funds passes muster, regardless of whether *Chevron* or *Skidmore* deference is applied.  *See* Maj. Op. 15 & n.2.  Since the *Chevron*-or-*Skidmore* question is not dispositive, I believe it was unnecessary for the majority to have decided the question.

Respectfully, I concur in the judgment.