# IN THE SUPREME COURT OF CALIFORNIA

FAMILY HEALTH CENTERS OF SAN DIEGO,
Plaintiff and Appellant,

v.

STATE DEPARTMENT OF HEALTH CARE SERVICES,
Defendant and Respondent.

S270326

Third Appellate District
C089555

Sacramento County Superior Court
34-2018-80002953-CU-WM-GDS

July 24, 2023

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

FAMILY HEALTH CENTERS OF SAN DIEGO v. STATE
DEPARTMENT OF HEALTH CARE SERVICES

S270326


Opinion of the Court by Kruger, J.


Federal and state Medicaid law entitles health care providers to government reimbursement for reasonable costs related to the care of Medicaid beneficiaries. The providers entitled to reimbursement include federally qualified health centers, or FQHCs, which are nonprofit health centers that receive funding from the federal government to provide basic health care to underserved populations. As a condition of participation in the FQHC program, health centers must provide services regardless of an individual's ability to pay. They are also required to offer outreach and education to enable members of underserved communities to obtain the health care services they provide.

In this case, an FQHC operator seeks reimbursement from the state Medicaid program for the costs of outreach and education activities aimed at Medicaid-eligible patients. The State Department of Health Care Services concluded the costs were categorically nonreimbursable. The Court of Appeal affirmed. We conclude the Department's conclusion rested on a misunderstanding of relevant legal principles governing the reimbursement of medical provider costs. We therefore reverse and remand for further proceedings.

## I.

This case involves the interplay between programs enacted by Congress to increase individuals' access to health care. The first of these programs is Medicaid, a federal-state cooperative program for the provision of medical care to certain low-income populations. (42 U.S.C. §§ 1396-1, 1396a(a)(10)(A)(i); see *National Federation of Independent Businesses v. Sebelius* (2012) 567 U.S. 519, 541–542, 575 [describing the program].) In return for federal funding, participating states — which is all of them (*id.* at p. 542) — agree to reimburse health care providers for the costs of delivering care to enrolled program beneficiaries. (42 U.S.C. § 1396a(a)(11)(B)(ii).)

The second program, created by section 330 of the Public Health Service Act, makes federal funding available to community-based health organizations to care for medically underserved populations. (42 U.S.C. § 254b(a)(1); see also *id.*, § 254b(e).) These organizations, knowns as "Federally qualified health centers" (e.g., *id.*, §§ 13295x(aa)(4), 254c-14(a)(2)), must provide health care to residents of geographical areas designated by the federal government as lacking sufficient health care services, or to special populations that have been so designated, such as those who engage in migrant or seasonal agricultural work, who are homeless, or who reside in public housing. (*Id.*, § 254b(a)(1), (3)(A).) An FQHC must provide "required primary health services" to all of its patients regardless of their ability to pay. (*Id.*, § 254b(a)(1)(A); see also *id.*, § 254b(k)(3)(G)(iii).) Because of the difficulties that target populations face in accessing health care, required primary health services include education of "the general population

served by the health center regarding the availability and proper use of health services" (*id.*, § 254b(b)(1)(A)(v)) as well as enabling services — that is, "services that enable individuals to use the services of the health center" — "including outreach and transportation services," and language interpretation for limited English speakers (*id.*, § 254b(b)(1)(A)(iv)). Congress added these requirements after the Committee on Labor and Human Resources identified education, outreach, and other enabling services as "essential to health centers' efforts to reduce the barriers to care" experienced by those targeted, and proposed the addition "to highlight the critical role that enabling services . . . play in the delivery of primary health services to underserved populations." (Health Centers Consolidation Act of 1995, Sen.Rep. No. 104–186, 104th Cong., 1st Sess. (1995).)

Although the Public Health Service Act provides some funding for FQHCs, it is not their only source of funding. The law provides that FQHCs are entitled to Medicaid reimbursement insofar as they provide covered health services to Medicaid beneficiaries. (42 U.S.C. § 1396d(a)(2)(C), (*l*)(2); see also Welf. & Inst. Code, § 14132.100, subd. (a) [adopting coverage for FQHC services as described by federal law].) Medicaid reimbursement for qualifying FQHC services is not optional. Health centers must "make every reasonable effort" to collect state reimbursement for the costs of providing health services to those eligible for Medicaid or "any other public assistance program or private health insurance program." (42 U.S.C § 254b(k)(3)(F).) And states, for their part, are obligated to pay FQHCs 100 percent of the costs of providing medical assistance to Medicaid beneficiaries that are "reasonable and related to the cost of furnishing such services." (*Id.*,

§ 1396a(bb)(2).) This " '100 percent reimbursement' " requirement was enacted "to ensure that health centers . . . would not have to divert Public Health Service[] Act funds to cover the cost of serving Medicaid patients," thus compromising their ability to provide care to those without any public or private health coverage. (*Three Lower Counties Community Health v. Maryland* (4th Cir. 2007) 498 F.3d 294, 297; see *ibid.* [discussing substantially similar predecessor to current law].)[1]

Both federal and state Medicaid law contain additional instructions about how to fulfill this 100 percent reimbursement requirement. Under federal law, Medicaid reimbursement to FQHCs is based on a prospective per-visit rate that includes the cost of covered services by physicians or other designated health professionals, as well as services and supplies "incident to" those services. (42 U.S.C. § 1395x(aa)(1)(A)–(B), (3); see also *id.*, §§ 1396a(bb), 1396d(a)(2)(C), (*l*)(2).) That rate may be adjusted when there are changes in the scope of services the health center provides. (*Id.*, § 1396a(bb)(3)(B).) State law codifies the same payment system. (Welf. & Inst. Code, § 14132.100, subds. (c)–(e).) State law further instructs that adjustments are "evaluated in accordance with Medicare reasonable cost principles." (*Id.*, subd. (e)(1); see 42 U.S.C. § 1396a(bb)(2), (4) [identifying the Medicare reasonable cost regulations as a permissible basis for calculating payment amounts].)

---

[1]    This law was amended in 2000 to implement the prospective payment system now in place, which similarly requires payment of 100 percent of the costs of furnishing services. (*Three Lower Counties Community Health v. Maryland, supra*, 498 F.3d at p. 298; 42 U.S.C. § 1396a(bb)(2).)

The reference to "reasonable cost principles" is to a set of regulations promulgated under the federal Medicare statute.[2] (42 U.S.C. § 1395c.)   Much like the Medicaid provisions governing FQHCs, the Medicare statute instructs that payments to providers be based on the "reasonable cost" of covered services, taking into account "both direct and indirect costs of providers of services."   (*Id.*, § 1395x(v)(1)(A).)   The implementing regulation specifies that payment must be based on reasonable costs that are "related to the care of beneficiaries," including "all necessary and proper costs incurred in furnishing the services."   (42 C.F.R. § 413.9(a) (2023).)

## II.

Plaintiff Family Health Centers of San Diego is a nonprofit corporation that operates multiple federally qualified health centers in San Diego County.

California participates in Medicaid through the California Medical Assistance Program, known as "Medi-Cal," which is administered by the State Department of Health Care Services (Department).   (Welf. & Inst. Code, §§ 14100.1, 14170, subd. (a)(1), 14203.)   In 2013, Family Health asked the Department for an increase in the per-visit Medi-Cal reimbursement rate for one of its clinics.   In a cost report supporting the request, Family Health listed "outreach" among its health care staff costs and later provided additional details, including job descriptions for

---

[2]   Medicare, another federal medical assistance program, provides payments to providers for the care of elderly persons and persons with disabilities.   The Medicare program is not relevant to this case except insofar as it has produced a body of agency guidance about the calculation of reasonable costs of care.

outreach staff, to a Department auditor. One position, for example, was an "Outreach Worker," who was tasked with providing "information and instruction" about Family Health resources through "street outreach" and by "meeting with people on an individual basis, making group presentations, participating in community events and developing accessibility as liaison for and guide to" the local Family Health clinic. A "Family Resource Center" outreach worker focused on educating parents about the importance of early childhood development and Family Health resources for young children; a "Community Outreach Specialist" conducted "educational presentations and home visits" for families referred for a Childhood Lead Poisoning Prevention Program; a "Family Planning Health Educator" provided "family planning education and counseling," focusing on "high risk and hard to reach" individuals who were, for example, homeless, substance using, or limited English speakers; and a "Senior" outreach worker engaged in "community education and outreach" to identify "senior citizens in need of mental health services" and to connect them to appropriate Family Health services.

The auditor concluded that the salaries and benefits for Family Health's outreach workers were not reimbursable "due to insufficient documentation demonstrating that they are related to services and supplies that are incident to a FQHC visit and a covered benefit." Family Health appealed, first

through informal administrative review and then, failing that, through a formal administrative hearing.[3]

At the administrative hearing, the Department auditor repeated his conclusion that the contested outreach costs were not reimbursable because they were not related to services and supplies incident to an FQHC visit. On cross-examination, the Department auditor stated that he was not familiar with federal law requiring FQHCs to engage in outreach. The auditor also acknowledged that some administrative costs — indirect costs not incident to a visit or covered benefit — were reimbursable under federal and state Medicaid law but was "not quite sure" why outreach was not such a cost.

The CEO of Family Health, Fran Butler-Cohen, testified at length about Family Health outreach. Family Health conducted outreach to try to engage with targeted populations in a variety of settings, including "group and organizational settings," in "church[] and community service center venues," "in the street, in schools, in agen[cies], [and in] business venues," and, for "HIV related outreach," in "LGBT related settings, such as bars, bathhouses, clubs" and "other public venues such as beaches and parks." Family Health outreach workers kept track of whether individuals then attended health

---

[3] An informal hearing may precede a formal hearing to clarify or resolve facts and issues in dispute. Unlike the formal hearing — which is conducted before an administrative law judge, must comply with a variety of procedural requirements, and results in a final decision — the informal review process is conducted by a hearing auditor and does not itself lead to a final decision of the Department. (Health & Saf. Code, § 100171; Cal. Code Regs., tit. 22, § 51016, subd. (a) (7), (8), (9), (11).)

center medical appointments, as well as whether those appointments were covered by Medi-Cal or other insurance. She emphasized the difficulties target populations faced in accessing care and described examples of federal and state guidance that characterized outreach as an allowable administrative cost under Medicaid and Medi-Cal.

Family Health also presented testimony from Kelly Hohenbrink, an expert in health industry finance and, specifically, in federally qualified health center audits. Hohenbrink testified that because outreach is a requirement of participation in the FQHC program, outreach costs were "reasonable and related to the cost of furnishing services" under applicable federal law; health centers would not be able to care for patients at all if they lost their health center status for failure to comply with the requirement.

After the hearing, the administrative law judge (ALJ) issued a proposed order finding that Family Health was not entitled to reimbursement for its outreach costs. The ALJ relied for this conclusion on the Provider Reimbursement Manual issued by the federal Centers for Medicare & Medicaid Services, which offers informal guidance on the application of Medicare reasonable cost principles. (Centers for Medicare & Medicaid Services, The Provider Reimbursement Manual, Part 1, Foreword (Provider Manual).)[4] Citing the sections of the

---

[4] Provider Manual available at <https://www.cms.gov/regulations-and-guidance/guidance/manuals/paper-based-manuals-items/cms021929> [as of July 24, 2023].

Provider Manual relating to a provider's advertising costs, the judge concluded that Family Health's outreach was a form of nonreimbursable advertising because it was designed "to bring new patients into the facilities."

The Chief Administrative Law Judge (Chief ALJ) initially adopted the judge's proposed order as the agency decision, but then issued a new decision after granting Family Health's motion for reconsideration. The Chief ALJ concluded that Family Health did not present sufficient evidence to meet the "fundamental reimbursement standard" that outreach was "related to the care of beneficiaries"; instead, Family Health conducted outreach "to attract new patients and increase patient utilization of services." Pointing to the Provider Manual guidance on advertising, the Chief ALJ concluded that the manual "specifically excludes Medicaid reimbursement" for these activities.

Family Health filed a petition for writ of administrative mandamus in the superior court to challenge the Department's ruling. The superior court denied the petition, agreeing with the Department that Family Health's outreach was not "appropriate and helpful" to patient care but instead merely sought to attract new patients, which made it nonreimbursable advertising.

The Court of Appeal affirmed. The court explained that Family Health's "outreach efforts involve going into public spaces such as on the street, at schools, business venues,

---

All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

beaches, and parks to attract new patients from its audiences within the general public, provide counseling regarding eligibility for services, and make medical appointments for services." (*Family Health Centers of San Diego v. State Dept. of Health Care Services* (2021) 67 Cal.App.5th 356, 368 (*Family Health Centers*).) The court acknowledged that "[s]uch services may benefit the recipient by increasing awareness of care available through [Family Health] and making the recipient feel more comfortable seeking care. And, such activities are required as part of [Family Health's] role as a FQHC grant recipient." (*Ibid.*) But the court concluded that it "was not an abuse of discretion to find that such activities had the purpose and effect of bringing in new patients and increasing utilization of [Family Health's] facilities, making them akin to advertising" that was not a reimbursable cost according to Provider Manual guidance. (*Id.* at p. 369.)

We granted Family Health's petition for review. In our review we employ the same standards as the trial court and the Court of Appeal. We consider whether the Department "proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Department] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) "In determining whether the agency complied with the required procedures and whether the agency's findings are supported by substantial evidence, the trial court and the appellate courts essentially perform identical roles. We review the record de novo and are not bound by the trial court's

conclusions." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479.) On " 'purely legal' " questions, we exercise independent judgment and a decision "must 'be reversed if based on erroneous conclusions of law.' " (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109.) Here, we conclude the Department's decision denying Family Health reimbursement for any of its outreach and education costs is based on erroneous conclusions of law, so we reverse and remand for further proceedings.

## III.

### A.

The framework for Medicaid reimbursement of FQHCs comprises an interlocking series of federal and state statutory and regulatory provisions. The federal Medicaid statute makes clear that, to avoid diverting FQHC grant moneys for the care of patients entitled to Medicaid assistance, states are obligated to pay FQHCs 100 percent of the costs of providing medical assistance to Medicaid beneficiaries, so long as the costs are "reasonable and related to the cost of furnishing such services." (42 U.S.C. § 1396a(bb)(2).) The Medicaid statute further instructs that in applying this standard, states may use reasonable cost principles developed under Medicare law. (*Id.*, § 1396a(bb)(2), (4).) Following this suggestion, California law expressly incorporates those regulations for purposes of determining how much FQHCs are owed for the care of Medicaid beneficiaries. (Welf. & Inst. Code, § 14132.100(e)(1), citing 42 C.F.R. pt. 413.)

Thus, by virtue of federal permission and state command, the Medicare reasonable cost regulations form the centerpiece

of our inquiry in this case. But much like the "reasonable and related" requirement set out in the Medicaid statute itself, the regulations are cast at a relatively high level of generality. The regulations explain that provider payments must be based on the "reasonable cost" of covered services "related to the care of beneficiaries," including "all necessary and proper costs incurred in furnishing the services." (42 C.F.R. § 413.9(a) (2023).) "Necessary and proper costs" are defined as "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common and accepted occurrences in the field of the provider's activity." (*Id.*, § 413.9(b)(2).) The regulations further specify that "[r]easonable cost includes all necessary and proper expenses incurred in furnishing services, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans." (*Id.*, § 413.9(c)(3).)

The level of generality in these instructions is intentional: In the Medicare program, the same reasonable cost standard applies to a wide variety of provider types, ranging from hospitals to home health agencies. (42 C.F.R. § 413.1(a)(2)(i), (iii) (2023).) The regulations thus acknowledge that the "costs of providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care. The provision in Medicare for payment of reasonable cost of services is intended to meet the actual costs, however widely they may vary from one institution to another." (*Id.*, § 413.9 (c)(2).)

The Medicare regulations contain no specific instructions for the evaluation of any particular cost, much less do they

directly answer the question whether an FQHC's costs of outreach and education can qualify as "reasonable and related" costs of care. They simply tell us, in general terms, that reasonable costs related to the care of beneficiaries include "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities"; that such costs may include both direct and indirect costs of care, such as administrative costs; and that they are usually the sort of costs that are "common and accepted" in the provider's field. Nothing in the language of the regulations clearly precludes reimbursement of an FQHC's expenditures on education and outreach services, which are not only common and accepted activities among FQHCs, but also listed among the very "primary health services" that such institutions must provide to the populations they serve. (See 42 U.S.C. § 254b(b)(1)(A)(iv)–(v).)

In the agency decision on review, the Chief ALJ acknowledged that Medicaid funding may be used for some outreach activities, citing informal federal agency guidance indicating that outreach may be appropriate and helpful in providing care to Medicaid and Medicaid-eligible patients. In its State Medicaid Manual, for instance, the federal Centers for Medicare & Medicaid Services (CMS) identifies "Medicaid outreach (methods to inform or persuade recipients or potential recipients to enter into care through the Medicaid system)" as an example of an administrative cost that is reimbursable under the Medicaid program. (CMS, State Medicaid Manual, Part 4,

§ 4302.2, subd. (G)(2), p. 4-312.)[5] A 1994 State Medicaid Director Letter likewise reiterates that Medicaid outreach as described in the State Medicaid Manual is "necessary for the proper and efficient administration of the State plan" for providing services covered by Medicaid. (Letter from Sally K. Richardson, Director, Medicaid Bureau, Health Care Financing Administration (now called CMS), to State Medicaid Directors, Dec. 20, 1994, p. 2.)[6]

The Chief ALJ in this matter, however, determined that this guidance concerning outreach activities did not resolve the question whether outreach conducted by Family Health was "reasonably related, directly or indirectly, to patient care." To answer that question, the Chief ALJ turned to the Medicare

---

[5] State Medicaid Manual available at <https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-items/CMS021927> [as of July 24, 2023].

[6] This general view is also echoed in informal Department guidance: a 2004 manual regarding Medi-Cal Administrative Activities, which stated that outreach is a reimbursable administrative activity when it informs "eligible or potentially eligible individuals about Medi-Cal programs and services and how to access them" (Dept. of Health Care Services, California School-Based MAA Manual (June 2004) § 5, Activity Codes: Descriptions and Examples, Code 4, Initial Medi-Cal Outreach, p. 5-5); and a 2011 Department memorandum regarding claims for reimbursement under a County-Based Medi-Cal Administrative Activities program, which stated that the "cost of providing general outreach to the local community is an integrated part" of a federally qualified health center's per-visit rate (Administrative Claiming Local and School Services Branch, mem. to Local Governmental Agency Coordinators for the County Based Medi-Cal Administrative Activities Program, Sept. 22, 2011).

14

Provider Reimbursement Manual, which contains more specific guidance on a wide variety of issues related to calculating and reimbursing Medicare costs. The Court of Appeal did the same, concluding the Department did not abuse its discretion in its decision by relying on the manual. (*Family Health Centers*, *supra*, 67 Cal.App.5th at p. 360.) Now, before this court, the parties' arguments likewise center on the meaning of the Provider Manual and the guidance it offers.

Though we, too, will consider the Provider Manual, we should be clear about the role the manual plays in the analysis. The manual is an informal guidance document; it does not "have the force and effect of law." (*Shalala v. Guernsey Memorial Hospital* (1995) 514 U.S. 87, 99; see *Tulare Pediatric Health Care Center v. State Dept. of Health Care Services* (2019) 41 Cal.App.5th 163, 175; Provider Manual, *supra*, Foreword [the manual "provides guidelines and policies" to implement Medicare reasonable cost regulations "but it does not have the effect of regulations"].)[7] But interpretations in "a non-binding administrative manual" are at least entitled to consideration to the extent they have the " 'power to persuade.' " (*Georgia v. Public.Resource.Org, Inc.* (2020) ___ U.S. ___, ___ [140 S.Ct. 1498, 1510]; cf. *Atrium Med. Center v. Dept. of Health & Human Serv.* (6th Cir. 2014) 766 F.3d 560, 571 (*Atrium Medical Center*) [collecting cases concerning the deference owed to interpretations in the Provider Manual].) And the Provider Manual offers guidance in a highly technical area governed by a

---

[7] The parties do not argue that the Provider Manual is entitled to greater deference as an agency's interpretation of its own regulations. (See *Kisor v. Wilkie* (2019) ___ U.S. ___, ___ [139 S.Ct. 2400, 2414].)

large and complex regulatory scheme. While the Medicare reasonable cost regulation speaks at a relatively high level of generality, the manual sets out a series of more specific instructions. Because these more specific instructions reflect the accumulated experience of the responsible agency, discussions about the proper interpretation and application of Medicare reasonableness principles often center on the Provider Manual, as they have in this case. (Cf., e.g., *Atrium Medical Center*, at p. 571 [noting that, "practically speaking, . . . courts tend to defer to statutory interpretations found in the [Provider Manual] regardless of which rule" of deference they apply].)

We therefore turn to the Department's reading of the Provider Manual, while keeping firmly in view the statutory and regulatory provisions underlying the informal agency guidance.

**B.**

The Provider Manual contains guidance on a wide variety of subjects related to calculating and reimbursing Medicare costs. In the decision on review, the Department relied on the Provider Manual's provisions regarding advertising costs, concluding that those provisions categorically prohibited outreach activities that attracted new patients and increased their use of health center services. Although it is unclear that the manual's discussion of advertising was written in contemplation of the type of activities at issue in this case, we likewise focus on those provisions for the value of the guidance they may offer in this context.

Advertising is among the topics covered in a chapter on costs related to patient care. (Provider Manual, *supra*, Chapter 21.) Tracking the reasonable cost regulations, the manual describes general principles for reimbursement of patient care

costs, stating that reimbursement must be based on the reasonable cost of covered services that are "related to the care of beneficiaries." (*Id.*, § 2100.) Costs related to patient care "include all necessary and proper costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities" and "are usually costs which are common and accepted occurrences in the field of the provider's activity." (*Id.*, § 2102.2.)

The Provider Manual's guidance on advertising costs likewise tracks the reasonable cost regulations. The guidance states that the allowability of advertising costs for reimbursement purposes "depends on whether they are appropriate and helpful in developing, maintaining, and furnishing covered services" and on "the facts and circumstances of each provider situation." (Provider Manual, *supra*, § 2136.) "To be allowable, [advertising] costs must be common and accepted occurrences in the field of the provider's activity." (*Ibid.*)

The manual goes on to distinguish between allowable and unallowable costs of advertising. The cost of advertising is allowed when it "is primarily concerned with the presentation of a good public image and directly or indirectly related to patient care." (Provider Manual, *supra*, § 2136.1.) This may include advertising information about visiting hours or the cost of "informational listings of providers" in a general resource, for example, a "telephone directory" or " 'yellow pages,' " or a directory of similar facilities. (*Ibid.*) Costs are allowed for advertising that apprises other health providers of "the availability of the provider's covered services" and serves a purpose "related to patient care" because such contacts "make

17

known what facilities are available" to provide needed health care services. (*Ibid*.) Allowable costs include the production and distribution of "informational materials" for health providers that "primarily refer to the provider's operations" and "contribute to an understanding of the role and function of the facility as a provider of covered health care in the community." (*Ibid*.)

The manual contrasts the costs of "public relations activity" (allowable) with the cost of "advertising to the general public which seeks to increase patient utilization of the provider's facilities" (not allowable). (Provider Manual, *supra*, § 2136.2.) Here, the Department determined that Family Health's outreach and education costs were categorically nonreimbursable because their purpose was to attract new patients and increase utilization of Family Health's facilities. (See *Family Health Centers*, *supra*, 67 Cal.App.5th at p. 369.)[8]

No one disputes that Family Health's outreach and education activities may increase patient utilization of its

_____

[8] Family Health argues that the final agency decision's reliance on section 2136.2 was misplaced because its outreach activities do not constitute advertising. Family Health emphasizes that the outreach at issue involved individual interactions directed toward specific populations, not promotional material directed to the "general public" (Provider Manual, *supra*, § 2136.2). It is unclear, however, whether person-to-person communications are categorically exempt from restrictions on the reimbursability of certain advertising costs. We need not decide that issue here. Even if Family Health's outreach activities are not strictly the sort of advertising contemplated in the Provider Manual, section 2136 may be considered to the extent it provides relevant, albeit nonbinding, guidance.

services.   The same is necessarily true of any FQHC that engages (as it must) in outreach and education activities — qualified health centers are required, as a term of their participation in the federal health center program, to offer both basic health services to underserved populations and to engage in education and outreach to enable members of these populations to avail themselves of the care the centers provide. (42 U.S.C. § 254b(a)(1), (b)(1)(A)(iv)–(v).)  Indeed, the controlling statute defines these required education and outreach activities as part of the "primary health services" FQHCs provide to the communities they serve.  (See *id.*, § 254b(b)(1)(A)(iv)–(v).)  We are not convinced, however, that these statutorily mandated services must be treated as nonallowable costs of advertising merely because they may lead to increased utilization of an FQHC's services.

Although the manual does describe advertising costs as unallowable when they involve "advertising to the general public which seeks to increase patient utilization of the provider's facilities" (Provider Manual, *supra*, § 2136.2), the remainder of the manual's advertising provisions make clear that an increase in patient utilization alone is not disqualifying. After all, other forms of advertising the manual describes as allowable may also increase patient utilization.  For instance, the manual treats as allowable the costs of providing information about providers and services related to patient care — information that presumably tends to facilitate patient utilization of those providers and services.  The manual likewise treats advertising that presents a good public image and informs the public about available services as allowable, even though

such advertising would also presumably tend to increase patient utilization of the provider's facilities.

The lesson we draw from reading the relevant manual guidance in full is that reimbursement is not prohibited for all forms of advertising that are aimed at the public or that tend to increase patient utilization. The distinction the manual draws appears to be a different one. As one court has put it, "One can readily glean from the [Provider Manual's] less than definitive guidance that providers walked a fine line between 'education' and 'marketing.'" (*Interim Healthcare, Inc. v. Spherion Corp.* (Del.Super.Ct. 2005) 884 A.2d 513, 569.) That is, the manual distinguishes between advertising designed to facilitate access to available health care services — an educational goal related to patient care — and advertising designed to encourage use of the provider's facilities over other facilities offering the same or similar services — a goal aimed at whether that care will generate revenue for the provider.

This understanding finds support in other aspects of the Provider Manual's guidance. For example, costs are allowed for advertising to other medical professionals to "make known" information necessary to "providing for patient care" (Provider Manual, *supra*, § 2136.1) — an educational purpose — but not to solicit facility use by practitioners not employed by the provider (*id.*, § 2136.2), an effort more closely related to attracting market share. Likewise, in the context of patients who elect a home health service when leaving a hospital, an agency's costs of persuading patients to request its services over those of other agencies are unallowable "patient solicitation" (*id.*, § 2113.2), whereas its costs of "[s]erving as an educational

resource" on available services related to patient care, are
allowable (*id.*, § 2113.4(A)).

This understanding also makes sense of Provider Manual
section 2136.2 in its broader statutory and regulatory context.
Again, the overarching statutory and regulatory instruction is
to cover the reasonable cost of services related to the care of
beneficiaries. (42 U.S.C. § 1396a(bb)(2); 42 C.F.R. § 413.9(a)
(2023).) The Provider Manual's general provisions reflect this
directive, reiterating that the costs of services "related to the
care of beneficiaries" (Provider Manual, *supra*, § 2100) are
reimbursable and "include all necessary and proper costs which
are appropriate and helpful in developing and maintaining the
operation of patient care facilities and activities" (*id.*, § 2102.2).
A narrower definition of unallowable advertising, one that does
not encompass information provided to support access to care,
comports with these mandates, and is consistent with the State
Medicaid Manual and other informal guidance that treats
outreach as reimbursable when it informs or persuades
potential Medicaid beneficiaries to enter into care.

Although case law applying the Provider Manual's
advertising guidance is limited, it reinforces the distinction
between advertising that educates potential beneficiaries about
needed care and advertising designed to generate revenue.
Thus, in one case involving television advertisements for a
convalescent care facility, the court upheld disallowance of
advertising costs after finding the ads, which targeted
caregivers and appeared to urge them to refer patients to the
provider's facility, were an attempt to increase patient levels at
the facility and reach the provider's goal of full capacity.
(*Convalescent Care, Inc. v. Department of Medical Assistance*

*Services* (2002) 59 Va.Cir. 123, 126; see also *Gosman v. U.S.*
(1978) 215 Ct.Cl. 617, 628 [upholding disallowance when
advertising was "intended to increase the general occupancy of
the facilities"].)  In another case, the court found disallowance
was reasonable when the design of an advertisement promoted
use of the provider's facilities over those of its competitors.
(*Superior Home Health Care, Inc. v. Secretary of HHS* (6th Cir.,
Oct. 13, 1999, No. 98-6254) 1999 U.S.App. Lexis 26251 at p. *9.)
By contrast, the costs of television and radio advertisements
that promoted an alcohol treatment facility were allowable
when they were " 'appropriate and helpful' " to the operation of
the facility and a " 'common and accepted' " tool in persuading
those in need of care to obtain it.  (*Advanced Health Systems,
Inc. v. Schweiker* (D.Colo. 1981) 510 F.Supp. 965, 969.)  In that
case, the court observed that " 'solicitation which motivates an
alcoholic to seek treatment does not become unrelated to his
care simply because it motivates him to seek treatment at the
provider's facility rather than not at all.' " (*Ibid*.)

These are admittedly nuanced distinctions.  Apparently
recognizing as much, the Provider Manual indicates that the
task of differentiating allowable advertising costs from
unallowable ones may require close examination of the facts and
context.  The manual notes that it may be necessary to
scrutinize a provider's advertising to determine whether the
"specific objective" of the activity is allowable.  (Provider
Manual, *supra*, § 2136.2; see also *id.*, § 2136.1 [whether the
provider is "primarily concerned" with presenting a good public
image related to patient care].)  And if the costs of advertising
"for any purpose" are not clearly allowable or unallowable, they

"may be allowable if they are related to patient care and are reasonable." (*Id.*, § 2136.1.)

Ultimately, as we have emphasized, the binding authority governing reimbursement for provider services requires the "reasonable cost" of covered services to be "related to the care of beneficiaries," and to include "all necessary and proper costs incurred in furnishing the services." (42 C.F.R. § 413.9(a) (2023).) No provision of the Provider Manual's informal guidance is reasonably read to mean that an FQHC's costs of outreach and education are categorically nonreimbursable under the applicable statutes and regulations merely because the outreach and education are designed to increase patient access to, and therefore utilization of, the basic health services an FQHC has agreed to provide, at low or no cost, to members of underserved communities.

## C.

In the final administrative decision on review, the Chief ALJ stated that the auditor reasonably concluded that Family Health outreach was "too attenuated" from the care of beneficiaries to qualify for reimbursement. The Chief ALJ reasoned that the purpose of Family Health outreach was "patient recruitment" and that the outreach was therefore a categorically unallowable advertising cost according to the Provider Manual.

For the reasons we have explained, the Chief ALJ was mistaken. The administrative findings here did not reveal unallowable revenue-driven interests behind Family Health's outreach activities. Rather, the Chief ALJ's decision referenced activities that were apparently related to increasing patient awareness of and access to Family Health services, and that

included making "new patients 'comfortable enough to seek care.'" Nothing in the cited sections of the Provider Manual, or in the underlying statutory or regulatory provisions, establishes that the costs of such activities are categorically nonreimbursable. And the Chief ALJ did not appear to consider the significance of other governing factors, such as whether the outreach activities were necessary and proper in the context of furnishing FQHC services, and common and accepted among FQHC providers. Because the Chief ALJ did not review the Department's audit determination "in the manner required by law," and the administrative "decision is not supported by the findings," her ruling was an abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).)

In its briefing before this court, the Department now concedes that Family Health outreach may have qualified for reimbursement to the extent that it provided "information to the public about the provider's services." But the Department contends that the Chief ALJ was justified in finding insufficient evidence to meet that standard, given the "limited evidence" Family Health presented on the point.[9]

---

[9]    Although it acknowledges that some forms of FQHC outreach may be reimbursable, the Department argues that outreach or education that takes place in a public place such as a beach — as opposed to a location intended for certain underserved populations, such as a homeless shelter — constitutes prohibited advertising to the general public. We are unpersuaded. The location and scope of the outreach may be relevant in determining whether its primary purpose is to educate underserved persons about available, low- or no-cost options for health care or else to generate revenue for the facility, but it is not alone dispositive.

We are not persuaded by the Department's contention. First, as we have explained, the Chief ALJ did not apply the relevant standard, so she could not have found that Family Health supplied insufficient evidence to meet it. Second, the Department's description of the evidence is not a fair characterization of the record. Though the Department now claims that Family Health "made no effort" to show how its outreach activities were related to patient care, Family Health presented extensive evidence and argument on this point. Through documentary evidence and witness testimony, Family Health asserted, for example, that outreach staff provided education and information about available Family Health services to medically underserved populations who faced obstacles accessing care; that Family Health kept track of whether, after being contacted, the individuals received medical care at a Family Health clinic and whether clinic services were covered by Medi-Cal or other assistance; that federal law required Family Health to conduct outreach because it enabled the populations served to access medical care; and that federal and state guidance characterized the type of outreach Family Health engaged in as an allowable administrative cost necessary to delivering Medicaid services.

The bottom line is this: Although the Chief ALJ may have alluded to the sufficiency of the evidence, the Chief ALJ's review of that evidence rested on a mistaken understanding of the relevant legal principles as they relate to an FQHC's outreach and education activities. We therefore direct the Court of Appeal to remand the matter for the Department to reconsider the reimbursability of Family Health's outreach and education costs under the applicable cost principles.

## CONCLUSION

We reverse the judgment of the Court of Appeal with directions to remand the matter to the Department for further proceedings consistent with this opinion.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Family Health Centers of San Diego v. State Department of Health Care Services

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 67 Cal.App.5th 356
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S270326
**Date Filed:** July 24, 2023

_____

**Court:** Superior
**County:** Sacramento
**Judge:** Steven M. Gevercer

_____

**Counsel:**

Douglas Cumming Medical Law, Douglas S. Cumming; Murphy, Campbell, Alliston & Quinn and George E. Murphy for Plaintiff and Appellant.

Hanson Bridgett, Kathryn E. Doi; Law Office of Regina M. Boyle and Regina M. Boyle for Avenal Community Health Center, Eisner Health, Golden Valley Health Centers, Innercare, La Maestra Community Health Centers, Neighborhood Healthcare, Open Door Community Clinic, Ravenswood Family Health Network, Shasta Community Health, TrueCare and WellSpace Health as Amici Curiae on behalf of Plaintiff and Appellant.

DJR García and Deborah J. Rotenberg for California Primary Care Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Janill L. Richards, Principal Deputy State

Solicitor General, Cheryl L. Feiner, Assistant Attorney General, Joshua Patashnik, Deputy State Solicitor General, Niromi W. Pfeiffer, Gregory D. Brown, Marianne A. Pansa and Kevin L. Quade, Deputy Attorneys General, for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

George E. Murphy
Murphy, Campbell, Alliston & Quinn
2220 Douglas Boulevard, #240
Roseville, CA 95661
(916) 400-2300

Joshua Patashnik
Deputy State Solicitor General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9628